In re Thomas BARRETT and Sharon B. Barrett, Debtors.

Thomas BARRETT, Plaintiff,

v.

COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION and Robert J. Gunn and John D. Green, Sheriff, City of Philadelphia, Defendants.

Bankruptcy No. 89–10738S.

Adv. No. 89–0635S.

United States Bankruptcy Court, E.D. Pennsylvania.

April 27, 1990.

Jerome Brian Blank, Philadelphia, Pa., for debtors.

Eugene Brazil, Fort Washington, Pa., for Robert J. Gunn.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Warren T. Pratt, Ellen McDowell, Philadelphia, Pa., for Commonwealth Federal Sav. & Loan Ass'n.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A.  INTRODUCTION

On appeal from our Adjudication and Order of August 17, 1989, reported at 104 B.R. 688, deciding this adversary proceeding, the district court affirmed all aspects of our decision except our determination that the pre-petition sheriff's sale of December 5, 1988, of the Debtor's home which we found had yielded less than seventy (70%) percent of the home's value met the Debtor's [1] burden of proving that the sale was a transfer of the home for "less than a reasonably equivalent value" and thus avoidable under 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i).  The district court vacated our Order granting relief to the Debtor and remanded the proceeding to us to conduct what it deemed the necessary "case-by-case adjudication," requiring consideration of the conditions of the sale as well as the price bid at the sale.

We find, principally on the basis of evidence submitted at a trial on remand by the defendant-purchaser at the sheriff's sale, and hence to which he is bound, that the conditions of the sale in issue, a "typical" Philadelphia County sheriff's sale, did not feature advertising nor encourage competitive bidding in any way comparable to a "normal" private sale of residential realty

---

1.  The underlying Chapter 13 case is a joint case. However, the Debtor's home is owned solely by the Husband–Debtor.  We therefore dismissed the Wife–Debtor as a plaintiff in this proceeding in the Order accompanying our Adjudication of August 17, 1989.  We shall refer to the Husband–Debtor throughout this Opinion as "the Debtor."

in Philadelphia. Considering these factors in addition to the depressed sale price of the premises, we reinstate our previous decision that the sale in issue may be set aside pursuant to 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i). We also enter an order which will complete the process of determining whether the Debtors can propose a confirmable Chapter 13 Plan which would allow them to retain their home, or, what is more likely, effecting the sale of the home for the benefit of the Debtors' creditors.

## B. THE AUGUST 17, 1989, ADJUDICATION AND THE DISTRICT COURT'S REMAND.

The decision reflected in our Adjudication of August 17, 1989, was a difficult one, requiring valuation of the home in light of variant appraisals from three qualified experts. 104 B.R. at 690–91. Difficult factual and legal issues were also presented in our determination that the Debtor was insolvent. *Id.* at 691–92, 692–94.

However, the district court affirmed our Adjudication as to these issues, indicating its disagreement only with the following passage of the Adjudication addressing our determination that, in light of our valuation of the home, the bid price did not constitute "reasonably equivalent value" for purposes of 11 U.S.C. § 548(a)(2)(A):

> The Debtors have, though just barely, met their burden of proving that the Husband received less than a reasonably equivalent value for the property in this transfer. *See In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 388–90 (Bankr.E.D.Pa.1988). The price received in the transfer ($66,000) is 69.5 percent of the fair market value of the Property of $95,000, slightly less than the seventy (70%) percent benchmark which we have consistently accepted. *See Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201, 203–04 (5th Cir.1980); [*In re Cole,* 81 B.R. 326, 329–30 (Bankr.E.D.Pa.1988) ("*Cole I*")]; [2] *In re Corbett,* 80 B.R. 32, 36–37 (Bankr.E.D.Pa.1987); *In re But-*

ler, 75 B.R. 528, 532–33 (Bankr.E.D.Pa. 1987), *rev'd on other grounds sub nom. Butler v. Lomas & Nettleton Co.,* [862 F.2d 1015 (3d Cir.1988) ]; and *In re Jones,* 20 B.R. 988, 993–94 (Bankr.E.D. Pa.1982) (per GOLDHABER, CH. J.). *See also In re Clark,* 99 B.R. 955, 956–57 (Bankr.W.D.Mo.1989) (finding that purchaser paid exactly seventy (70%) percent of value does not protect a sheriff's sale from attack under § 548(a)(2)).

The district court's critique of our reasoning on this point was as follows, 111 B.R. 78, 80–81:

> *Durrett's per se* rule would discourage bidding at foreclosure sales if only because of the uncertainty as to hindsight appraisement and the expense, delay, and inconvenience caused by bankruptcy proceedings. Arguably, it would have the counter-productive effect of depressing foreclosure sale prices. *See In re Alsop,* 14 B.R. 982, 987 (Bankr.D.Alaska 1981), *aff'd,* 22 B.R. 1017 (D.Alaska [1982] ). Conceptually, it creates a *de facto* redemption right in bankruptcy that conflicts with the policies underlying state foreclosure statutes. *See id.*
>
> On the other hand, an irrebuttable presumption that the price obtained at foreclosure sale constitutes "reasonably equivalent value" would frustrate the trustee's avoidance power—a consequence not intended by the Code. *See In re Madrid,* 21 B.R. [424,] 428 [Bankr. 9th Cir.1982] (Volinn, J., dissenting).
>
> A sounder approach, adopted by the Seventh Circuit in *Matter of Bundles,* 856 F.2d 815 (1988), is case-by-case adjudication. As *Bundles* notes, while fair market value is a starting point, the bankruptcy court
>
> > "must focus ultimately on the fair market value as effected by the fact of foreclosure....[T]he bankruptcy court also must examine the foreclosure transaction in its totality to determine whether the procedures employed were calculated not only to secure for the

---

**2.** This Opinion is referenced as *Cole I* to distinguish it from its sequel, *In re Cole,* 89 B.R. 433 (Bankr.E.D.Pa.1988) ("*Cole II*"), cited in our Ad-

judication, 104 B.R. at 693, 694, and in this Opinion at page 177 *infra.*

mortgagee the value of its interest but also to return to the debtor-mortgagor his equity in the property."

856 F.2d at 824.

Relevant factors include whether competitive bidding was encouraged, whether the sale was widely advertised, id. at 824, and the arms's length relationship of the parties. There is no reason to believe those factors were lacking here. The bankruptcy court did not mention them but noted that appellant was a bona fide purchaser. The order setting aside the sale will be vacated and the action remanded for consideration in light of all the circumstances surrounding the foreclosure sale of debtor's property.

## C. PROCEEDINGS IN THIS COURT SUBSEQUENT TO AUGUST 17, 1989.

A very short history of this proceeding and the underlying main bankruptcy case is recited in the Adjudication, 104 B.R. at 689–90, and will not be repeated here. On the date we first learned of the pendency of the district court's decision, February 13, 1990, we were nearing the end of the process of resolving the issues expressly left unresolved in the Adjudication, *i.e.*, determining the extent of the liens of Commonwealth Federal Savings & Loan Association, the pre-sale mortgagee of the home ("CFSLA"), and of Robert J. Gunn, the purchaser at the sale ("Gunn"), and setting the stage for ascertainment of whether the Debtors could propose a confirmable plan in their main bankruptcy case. Established on that date were the bases for Orders of February 16, 1990, and February 22, 1990, respectively, establishing the amount of the secured proofs of claim of CFSLA and Gunn at $36,310.64 and $9,503.69, respectively.

We also had decided and indicated orally to counsel for CFSLA and the Debtors that the Debtors' efforts to propose a Chapter 13 plan which contemplated curing the pre-sale arrears of CFSLA's mortgage, as opposed to liquidating that claim in full in the Debtors' plan, would not be permitted. We reasoned that the invalidation of the sheriff's sale of December 5, 1988, merely restored the parties to the status quo that existed on the moment just prior to the sheriff's sale. *See Cole II, supra,* 89 B.R. at 436–38. The Debtor's right to cure his mortgage default had expired when he failed to cure the arrears a full one hour before the sale, pursuant to applicable Pennsylvania law, 41 P.S. § 404(a). Thus, the Debtor's only recourse was a plan which would contemplate paying off CFSLA's allowed secured claim in full, as opposed to curing arrears. *Compare See, e.g., In re Rivera,* 108 B.R. 553, 554–55 (Bankr.E.D.Pa.1989) (a debtor filing bankruptcy within one hour of a sheriff's sale is permitted to propose a plan which pays off a mortgagee's allowed claim in full).

This result is also not surprising when it is recognized that § 548(a) is a remedy for creditors to recoup property of the estate, and the relief provided to debtors thereby is only incidental thereto. As we note at page 184 *infra,* providing sufficient funding. to liquidate the secured claims of CFSLA, Gunn, and possibly other creditors, is only one of the impediments to the Debtors' ability to propose a plan which contemplates retention of their home as opposed to its liquidation to pay other creditors.

## D. § 548(a)(2) HAS BEEN THE SUBJECT OF WIDELY DIVERGENT INTERPRETATIONS BY THE VARIOUS COURTS OF APPEALS.

Given the divergence of receptivity of the Courts of Appeals to the use of 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i) to set aside sheriff's sales, it is hardly surprising that the district court would suggest a slightly different approach in confronting this problem than that suggested by this court in our Adjudication in this case and in *Cole I, Corbett,* and *Butler, supra.*

The Fifth Circuit, as reflected in its decision in *Durrett, supra,* 621 F.2d at 203–04, and its later decision in *Abramson v. Lakewood Bank & Trust Co.,* 647 F.2d 547, 548–49 (5th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), has long held that a sheriff's sale can be overturned as a fraudulent conveyance, particularly when the sale yields less than

seventy (70%) percent of the value of the property sold.

The Ninth Circuit expressly rejected this conclusion, on the alternative bases that a sheriff's sale is not a "transfer," *In re Madrid,* 725 F.2d 1197, 1200–01 (9th Cir. 1984), a result subsequently undermined by amendments to 11 U.S.C. §§ 101(50) and § 548(a)(2), *see Butler, supra,* 75 B.R. at 531 n. 2; and that a properly-conducted sheriff's sale is conclusively presumed to yield the fair market value of the property sold. *In re Madrid,* 21 B.R. 424, 426–27 (Bankr. 9th Cir.1982), *aff'd, Madrid, supra.*

Only the Sixth Circuit appears to have followed the lead of the *Madrid* Bankruptcy Appellate Panel ("BAP"). *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1138–40 (6th Cir.1985).

The reasoning of *Madrid* was expressly rejected by the Seventh Circuit in *Bundles, supra,* 856 F.2d at 819–20; and by the Eighth Circuit in *In re Hulm,* 738 F.2d 323, 327 (8th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984). However, the alternatives suggested by the *Bundles* and *Hulm* courts are themselves distinct. *Hulm* remands a lower court decision similar to that of the *Madrid* BAP for, simply, valuation testimony. *Id.* *Bundles* also remands a lower court decision which adopted the reasoning of the *Madrid* BAP, but emphasizes that the conditions of the sale as well as the bottom-line value received must be considered on remand. 856 F.2d at 823–25.

The Eleventh Circuit, though bound to follow *Durrett,* refused, in *In re Littleton,* 888 F.2d 90, 92–94 (11th Cir.1989), to adhere to the *Durrett* dictum that any sale yielding less than seventy (70%) percent of the value of the property must be set aside, finding application of the rule inapplicable in the case of a sheriff's sale by a junior lienholder.

The Third Circuit, in reversing our *Butler* decision on other grounds, assumed *arguendo,* without deciding nor disapproving our other decisions consistent with *Durrett,* that § 548 applied to foreclosure sales. 862 F.2d at 1016. The law hence remains unclear in this Circuit.

## E. THE DISTRICT COURT ADOPTED THE BUNDLES "CASE–BY–CASE ADJUDICATION" APPROACH.

In the absence of direction from the Third Circuit Court of Appeals, the district court expressly embraced the approach of *Bundles,* which rejected the reasoning of *Madrid* and, in certain respects, *Durrett* as well, and held that both the comparison of the sale price to value *and* the conditions of the sale must be considered on a case-by-case basis to determine whether a sale may be set aside on the basis of § 548. This decision appears to reflect a trend of the recent cases, especially in those Circuits not bound by clear authority to the contrary. *See In re National Environmental Systems Corp.,* 111 B.R. 4, 10 (Bankr.D.N.H.1989); *In re Brown,* 104 B.R. 609, 613–17 (Bankr.S.D.N.Y.1989); *In re Lindsay,* 98 B.R. 983, 988–91 (Bankr.S.D.Cal.1989); *In re General Industries, Inc.,* 79 B.R. 124, 129–34 (Bankr.D.Mass.1987); *In re Pruitt,* 72 B.R. 436, 444–46 (Bankr.E.D.N.Y.1987); *In re Ruebeck,* 55 B.R. 163, 167–68 (Bankr.D.Mass.1985); and *In re Adwar,* 55 B.R. 111, 113–15 (Bankr.E.D.N.Y.1985).

## F. THE RECORD MADE IN THIS PROCEEDING ON REMAND.

The parties in this case reflected some confusion regarding the practical repercussions of the district court's decision. After a conference of February 22, 1990, they ultimately opted to present testimony at a trial supplemental to the initial trial of August 3, 1989, to be held on March 22, 1990. The confusion appeared to lie in uncertainty of both parties as to the relative significance of the ratio of the bid to the value of the home as opposed to the conditions of the sale and how the burden of proof was allocated. Did Gunn have the burden of showing encouragement of bidding, advertisement, *and* an arm's length relationship (to CFSLA) especially in light of this court's finding that the bid price was inadequate? Or did the Debtor bear the burden of showing that bidding was not encouraged, advertisements were inadequate, *and* that there was less than an arm's length

relationship of the purchaser to CFSLA in order to set aside the sale, even though this court had already found the bottom-line bid price inadequate? [3]

The Debtor's strategy at the supplemental trial was to establish, by calling the sheriff's solicitor and the publisher of the Philadelphia Tribune, that the requisite notice of the sale published in a newspaper of "general circulation" was confined to the Tribune, a self-declared newspaper of the Black community, the circulation of which was minuscule in the predominantly white-inhabited area of the Debtor's home.[4]

Gunn testified concerning the intense bidding on the home at the sale of December 5, 1988, which included, by his estimation, about 20 bidders and over 450 individual bids. Both Gunn and the sheriff's solicitor testified that this volume of bidding activity at a Philadelphia County sheriff's sale is very rare.

Gunn then called I. Maximilian Martin, a Philadelphia realtor and appraiser for over 40 years who was past President of the Philadelphia Board of Realtors and is presently President of Berean Savings Association, the only Black-owned savings and loan association in the Philadelphia area, as his well-qualified expert. Martin described the ordinary conditions in private sales of realty in the Philadelphia area, which are characterized by intense individualized activities by a broker working on a commission basis, strategic advertisements, and a large volume of sales on credit, in which the purchase loan is secured by a mortgage. He compared these conditions to those of Phil-

adelphia sheriff's sales, testifying that sheriff's sales are usually made to attorneys representing the judgment creditors or speculators seeking to get bargains, in cash purchases. Martin opined that properties were sold at sheriff's sales at "substantial discounts," often by as much as fifty (50%) percent of the actual market value of the properties sold. For that reason, he stated, prices paid at sheriff's sales are rarely given much consideration in making appraisals of properties.

## G. PREVIOUS DECISIONS OF THIS COURT EMPHASIZE THAT THE LOSS INCURRED BY THE DEBTOR'S ESTATE BY A TRANSFER (OR SHERIFF'S SALE) IS THE FOCUS OF A § 548 PROCEEDING.

Prior to the district court's instant decision, we had published a number of decisions addressing different contexts in which problems which arose in the valuation process in deciding proceedings instituted under § 548. In *Cole I, supra,* we addressed the difficult issue of measuring whether reasonable value has been exchanged in a situation where the purchaser at a sheriff's sale is the judgment creditor itself. There, we posited the use of two alternative methods for measuring whether reasonably-equivalent value has been given: "[c]ompare the valid liens cleared off in the sale to the value of the premises [and] ... [c]ompare the bid price to the equity lost by the Debtor in the sale." 81 B.R. at 330. We then concluded that, if either method "yields a ratio of less than seventy

---

**3.** This uncertainty reflects a by-product of the case-by-case approach. The *Durrett* rule had the benefit of establishing certainty as to whether a given sale could be overturned, despite that its *Madrid* detractors criticized it for the very reason that it disrupted the certainty of the outcome of such proceedings. The bidder at a sheriff's sale controlled by *Durrett* always had it within his power to bid in a figure above the seventy (70%) percent figure and insulate the sale from attack.

**4.** The sheriff's office alternates among the three Philadelphia papers in allocating which of them will print all of the requisite three published advertisements of any given sale. The other two newspapers, the Philadelphia Inquirer and the Philadelphia Daily News, were alleged to

serve a much broader racial cross-section than the Tribune. The sheriff's solicitor testified that a policy of publishing advertisements of sheriff's sales for each area of the City in small, local newspapers has been instituted in early 1990, presumably to encourage more substantial advertisement in papers of general circulation which are local to properties sold. Notice of all sales is also published in the local legal newspaper, the Legal Intelligencer. See Pennsylvania Rules of Civil Procedure 3129.2(d) (publication of a sheriff's sale is required to be provided "once a week for three successive weeks in a newspaper of general circulation and in the legal publication ... designated by rule of court for publication of notices").

(70%) percent, the sale should be subject to being set aside." *Id.*

We adopted these methods because we believed that they served the end of recovering property for a debtor's estate of which it had been "unreasonably depleted as a result of the transfer." *In re Frascatore,* 98 B.R. 710, 717 (Bankr.E.D.Pa.1989) (*Cole I* test applied, but sheriff's sale to creditor sustained).

The earlier *Corbett* case, like the instant case, presented the simpler scenario in which the purchaser was a party entirely independent from the judgment creditor. There, we compared the purchase price bid at the sheriff's sale to the fair market value of the premises to conclude that "reasonably equivalent value," pursuant to § 548(a)(2)(A), had not been paid for the property in issue. 80 B.R. at 37.

Scenarios even more complex than the *Cole I* facts arise when the property is subject to other liens which are either junior or senior to the judgment which is the basis for the sheriff's sale. In *Littleton, supra,* the court held that the *Durrett* rule that a sale at which the bid price was less than seventy (70%) percent of the value of the property sold could not be applied because it failed to consider the impact of the sale upon junior liens. The court focused upon the fact that the estate was deprived of little or no equity by the sale, 888 F.2d at 93, concerns mirroring those which we deemed significant in *Cole I, supra.*

In a characteristically carefully-reasoned decision, *In re Brasby,* 109 B.R. 113, 120–25 (Bankr.E.D.Pa.1990), our colleague,

Judge Fox, considered a situation where the purchaser at a sheriff's sale was a junior judgment creditor and lienholder. In declining to invalidate that sale, Judge Fox reasoned that "the true issue is not whether the transferee has or will obtain a large return on his purchase price, but whether the estate has suffered a significant loss." 109 B.R. at 121.[5]

## H. OUR APPLICATION OF THE PRINCIPLES ESTABLISHED BY THE DISTRICT COURT'S PRINCIPLES TO THE FACTS AT HAND: THE CONDITIONS OF THE SALE IN ISSUE REFLECT LACK OF WIDE ADVERTISEMENT AND LACK OF ENCOURAGEMENT OF THE BIDDING COMPARABLE TO A PRIVATE SALE AND HENCE, GIVEN THE DEPRESSED SALE PRICE OBTAINED IN THE SALE, IT MUST BE SET ASIDE.

We are now prepared to apply the principles set down by the district court to the facts developed at, primarily, the supplemental trial of this proceeding on March 22, 1990. Our first task is determining the relationship between the sale price received and the conditions of the sale, the latter of which the district court has mandated us to consider. Although the district court focuses solely upon our need to consider the conditions of the sale on remand, we do not understand that court to have suggested that we must exclude or de-emphasize the significance of comparison of the bid price to the value of the property sold. Rather,

---

5. *Brasby* appears to criticize the reasoning of *Cole I,* insofar as we declined, in *Cole I,* to consider the total amount payable by the purchaser to close the sale as opposed to the amount of the pre-sale liens on the property. With all due respect, we believe that a focus upon the loss to the debtor's estate in the sale requires the conclusion that the impact upon the debtor's pre-sale liens affected by the sale are the more significant focal point. Judge Fox acknowledges, 109 B.R. at 122 n. 11, that the only district court decision in the Third Circuit is consistent with *Cole I* and not with *Brasby* on this point. *Ananko v. Harsanyi,* 91 B.R. 231, 236–37 (D.N.J.1988).

We also do not necessarily embrace the method utilized by Judge Fox to determine the interests of the debtors' estate lost in the sheriff's sale at issue in *Brasby. See* 109 B.R. at 123–24. In *Cole I,* 81 B.R. at 330, not addressing the situation where a sale occurs on a junior lienholder's judgment, we held that the liens cleared off by the sale should be compared to the value of the premises. In the context of a sale by a junior lienholder, it would seem appropriate to compare the liens cleared off by the sale to the value of the premises over and above the amount of the senior liens, at least in certain circumstances.

In sum, we would agree that, in multiple-lien situations, a careful case-by-case analysis is necessary.

we believe that the district court focused on the sale conditions because our Adjudication had not addressed this issue at all. The district court therefore considered it necessary to direct us to consider the sale conditions in addition to the consideration of the price paid at the sale.

The conclusion that the ratio of the amount bid to the value of the property retains significance under the principles set down in the district court's decision is supported by the apparent reliance of the district court upon the reasoning in *Bundles*, and the emphasis by the *Bundles* court upon the value received, as well as upon the conditions of the sale, as considerations appropriate in determining whether a sheriff's sale yielded a sale price "reasonably equivalent" to the value of the property sold. 856 F.2d at 123–25. It must be recalled that *Bundles* was a *reversal* of decisions of the lower courts which focused solely on the sale conditions and refused to set aside the sheriff's sale in issue because the conditions of the sale were found to be in accordance with applicable state law. *Id.* at 817–19.

We note that other courts have approached the relationship between the sale price/value ratio and the conditions of the sale differently. In *Lindsay, supra,* the court suggests that the conditions of the sale must be explored first, and that the sale price/value ratio should be considered only if the conditions necessary for a "commercially reasonable" sale are absent. 98 B.R. at 991. However, the *Lindsay* court then proceeds to find a sheriff's sale performed in accordance with the applicable state law to not have been conducted in accordance with "commercially reasonable" conditions, and the court proceeds to set aside a sale in which the sale price/value ratio was sixty-four (64%) percent. *Id.* at 992.

*Brown, supra,* provides a contrasting analysis. The court there theoretically adopts the *Lindsay* approach. 104 B.R. at 616. However, applying that theory quite differently than the *Lindsay* court, the *Brown* court concludes that the presence of nine bidders at the sheriff's sale of the debtor's property in issue establishes per se that "it is quite evident that the sale was widely advertised." *Id.* The *Brown* court therefore refuses to set aside a sheriff's sale at which the successful bid was less than half of the value of the property sold. *Id.* at 611, 616.

Several courts suggest that the conditions of the sale are purely secondary to the value received in the sale itself. Thus, in *Hulm, supra,* 738 F.2d at 327; and *Ananko, supra,* 91 B.R. at 236–38, the proceedings are remanded to the respective bankruptcy courts to consider only the issue of the sale price to fair market value ratio, with no directive made regarding investigation of the conditions of the sale. *See also Clark, supra* (court applies reasoning of *Hulm* to conclude that a sale of property for 70% of its value should be set aside, despite the apparent fulfillment of the *Durrett* ratio); and *In re Auxano, Inc.,* 96 B.R. 957, 963 (Bankr.W.D.Mo.1989) (court rejects "mechanical approach" of *Durrett,* but concludes, in an articulated case-by-case test that does not include consideration of the conditions of the sale, that a sale yielding 69% of the value of the property sold should be set aside).

Of particular interest are the assessments of sheriff's sales as proceedings unlikely to produce "commercially reasonable" sale prices in *Brasby,* 109 B.R. at 125; *National Environmental Systems,* 111 B.R. at 11; and *General Industries,* 79 B.R. at 131–32. In *General Industries, id.,* the court levels the following attack on the reasoning of *Madrid* and its progeny:

> All of these arguments have a common flaw: they assume that state foreclosure procedures are designed to attract bidders and to bring the highest price possible under the circumstances for real property. Quite often the opposite is true. Most state real estate foreclosure laws require little in the way of advertising or other promotional efforts, regardless of whether or not sales are judicially supervised. *See* Ehrlich, *Avoidance of Foreclosure Sales as Fraudulent Conveyances: Accommodating State and*

*Federal Objectives*, 71 Va.L.Rev. 933, 961–62 (1985).

Addressing the procedures in the court's own particular jurisdiction, the court states, *id.* 79 B.R. at 132, as follows:

We conclude that the Massachusetts procedural requirements for real estate foreclosure are too minimal to control the question of reasonably equivalent value under § 548 because they are inherently ineffective in producing equivalent value.

Judge Fox, in *Brasby*, thusly evaluates the lack of propensity of sheriff's sales in this jurisdiction to yield a commercially reasonable sale price:

Furthermore, such foreclosure sales will rarely be advertised in a manner designed to attract the highest possible bid, and so will rarely be conducted in a commercially reasonable manner. *See In re Lindsay, In re General Industries, Inc. The notice provisions of foreclosure sales are primarily designed to meet due process interests of owners and lien creditors and not to maximize the sale price.*

Not surprisingly, given their disdain with the state procedures as a basis for obtaining the fair market value of properties, the courts in neither *General Industries* nor *Brasby* indicate any significant concern with whether the conditions of the respective sheriff's sales in issue complied with applicable state law. *See also* S. Ehrlich, *supra*, 71 VA.L.REV. at 974–80 (suggests that state foreclosure proceedings should be upgraded in the areas of advertising and providing an alternative to requiring cash purchases if state procedures are to be deemed commercially reasonable).

The *Lindsay* decision, though containing no such graphic verbal assessment of the inability of a sheriff's sale to yield a commercially reasonable sale price, is even more striking in its result in pointing out the deficiencies of the sheriff's sale process as a means for obtaining a price reasonably equivalent to the fair market value of properties sold at sheriff's sales. The *Lindsay* court held that, if the conditions of a sale process are commercially reasonable, the price received in the sale, even if very low

in relation to value, is unassailable. 98 B.R. at 991. Further, the *Lindsay* court expressly finds that the applicable state law sheriff's sale notice requirements were met as to the sale in issue. *Id.* at 991–92. Nevertheless, the judgment creditor's inability to prove that it "made any effort to achieve the best price at the sale" by appraising it or advertising it widely prior to the sale is found to be a basis for concluding that commercially reasonable sale conditions were not present, and the sale in issue was set aside. *Id.* at 991–92.

Finally, we note that in most states, there is a right of redemption subsequent to a sheriff's sale. 47 AM.JUR. 2d 561–62 (1969); and R. Zinman, J. Houle, & A. Weiss, *Fraudulent Transfers According to Alden, Gross & Borowitz: A Tale of Two Circuits*, 39 BUS. LAWYER 977, 1006–07 nn. 143 & 144 (1984). *See also Brown, supra*, 104 B.R. at 613. Sheriff's sales in such jurisdictions are not final, and the amounts bid at sheriff's sales in these jurisdictions could be expected to be depressed to account for the contingency of the judgment debtor's redemption. However, in Pennsylvania, "the purchaser at a sheriff's sale obtains vested equitable ownership of the property at the fall of the hammer." *Butler, supra*, 862 F.2d at 1019. Hence, we would expect the prices received at a Pennsylvania sheriff's sale to be closer to fair market value than those in jurisdictions where post sheriff's-sale redemption is possible. A low bid at a Pennsylvania sheriff sale presents, without question, a situation in which a purchaser makes a profit at the expense of the estate of a debtor whose property is subject to a sheriff's sale.

The most significant portion of the record in this case on remand relative to the conditions of the sale is the testimony of Martin, Gunn's own eminently-qualified witness, that a Philadelphia sheriff's sale cannot be expected to bring a commercially-reasonable price for a property sold at the sale. See page 179 *supra*. Martin clearly emphasized the dichotomy between an "ordinary" private sale and a "forced" sheriff's sale in Philadelphia, and convinc-

ingly opined that a sheriff's sale frequently yields less than fifty (50%) percent of the fair market value of the property sold.

There is no evidence that CFSLA or any other party made any effort to encourage bidding or advertise the sheriff's sale of the Debtor's home on December 5, 1988, beyond the minimum required by Pennsylvania state law. *Compare General Industries, supra,* 79 B.R. at 132–33 (court describes impact of the earlier *Ruebeck* decision of that court in prompting judgment creditors to provide more than the minimal state law requirements on notice of sheriff's sales). In fact, CFSLA's counsel admitted, in a colloquy on February 22, 1990, that no measures other than the minimum required under state law were undertaken by it to advertise the sheriff's sale of December 5, 1988.

The fact that the advertising of the sale was published in the Tribune as opposed to another newspaper of wider circulation in the community where the home was located is another factor supporting the conclusion that this particular sheriff's sale was not widely advertised. In *National Environmental Systems,* 111 B.R. at 6, 12–13, the court set aside a sale of a property which brought sixty-eight (68%) percent of its fair market value principally because the advertisement of the sale was published in a newspaper which was more distant from the property than two other newspapers of general circulation.

However, perhaps even more significant a factor is the testimony of Martin, putting on the record what the *Brasby, General Industries, National Environmental Systems,* and *Lindsay* courts were willing to find as a matter of law: that a sheriff's sale, even if conducted in strict accordance with state law, is simply not the equivalent of a commercially-reasonable sale.

We are mindful of Gunn's testimony that the bidding on the property at the sale in issue was unusually spirited and that he has an arm's length relationship to CFSLA, the Debtors, and any other parties interested in this matter. The arm's length relationship is, we submit, not very significant in a public sheriff's sale context. It may be assumed that a buyer at such a sale, where any stranger may bid, is comparable to a stranger making a bid. This condition would appear to us to be far more relevant in the instance of a private transfer which is challenged as a fraudulent conveyance, or a classic fraudulent conveyance of valuable property by a debtor to relatives or friends to evade creditors. *Compare In re Brantz,* 106 B.R. 62, 67–68 (Bankr.E.D.Pa. 1989).

With all due respect to the *Brown* court, which was greatly impressed with the number of bidders at the sheriff's sale there in issue, we cannot attach much significance to this issue. We have no information regarding these bidders. Martin and the sheriff's solicitor testified that almost all bidders at Philadelphia sheriff's sales are speculators looking for bargains who are prepared to put up cash for their purchase. The bids of one or one hundred of such parties is not indicative of the value which would be paid by a purchaser willing to buy a home under "ordinary" sale conditions who typically finances his purchase with a loan secured by a mortgage. The important issue is whether competitive bidding by buyers similar to those available on the open market were encouraged to bid. There was no evidence that this occurred, and it is extremely unlikely that it actually did transpire here.

We therefore conclude that the conditions of the instant sale did not evince the requisite encouragement of competitive bidding and wide advertisement necessary to sustain the sale on the basis of the conditions under which it occurred. The district court obviously did not conclude that the sale price received was, as a matter of law, commercially reasonable. If it had, the district court would have simply reversed the Adjudication rather than remanding the proceeding to us.

We are not therefore shaken by the decision of the district court from our conclusion that the price received at the sheriff's sale of December 5, 1988, being less than seventy (70%) percent of the fair market value of the readily saleable commodity of

residential realty in a desirable neighborhood, per the testimony of Anthony Salvitti at the trial of August 3, 1989, reflected a sale price far less than the reasonably equivalent value of the home in question. The actual value received in a sale, irrespective of its conditions, is still the single most important factor of its commercial reasonableness. As Judge Fox points out in *Brasby*, the Third Circuit Court of Appeals has held that " '[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets.' " *In re Abbotts Dairies of PA, Inc.*, 788 F.2d 143, 149 (3d Cir.1986) (quoting *In re Rock Industrial Machine Corp.*, 572 F.2d 1195, 1197 n. 1 (7th Cir.1978)). A poorly-advertised sale which brings a commercially-reasonable price cannot be attacked under §§ 548(a)(2)(A) and (a)(2)(B)(i). Nor can the sale of a valuable home, sold at a fraction of its value, be upheld merely because all of the state law requirements for forced sales have been punctiliously satisfied. While the district court has foreclosed the use of the *Durrett* 70% benchmark as a conclusive or even a presumptive factor, it is clear that, when the commodity sold is readily marketable under conditions which could be expected to yield close to the full market value of the property, and is not sold under such conditions, receipt of less than 75% of the fair market value is a significant factor in determining whether a sale should be set aside because it is not "commercially reasonable."

Considering the inadequate sale price bid and the inadequate sale conditions present at the instant sale, we reinstate our prior holding that the sheriff's sale of the Husband's home of December 5, 1988, must be set aside.

**6.** Of course, it is possible that some of these creditors, being relatives and friends, will not file Proofs of Claim. The claim docket reveals, except for claims of CFSLA and Gunn, only a claim of the City of Philadelphia, $161.72 of which is secured and $601.61 of which is unsecured, and three other unsecured claims totalling $6,130.02. The Debtors may be able to liquidate the total allowed claims of about $52,-000 over the course of his Plan.

## I. OUR DECISION APPEARS TO PROPERLY SERVE THE INTERESTS OF THE DEBTORS' CREDITORS, NOT THE DEBTORS THEMSELVES.

Despite our ruling that the sheriff's sale of December 5, 1988, may be set aside pursuant to 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i), it is doubtful whether the result of the proceeding will be the preservation of the home as a dwelling for the Debtors. In addition to being obliged to liquidate the secured claims of CFSLA and Gunn, totalling about $46,000 over the course of their Plan, see page 177 *supra*, the Debtors must be mindful of 11 U.S.C. § 1325(a)(4), reciting one of the conditions which must be met to allow the confirmation of a Chapter 13 Plan of Reorganization. That Code section requires that unsecured creditors receive, by way of the Debtors' plan, at least as much as they would have received under a Chapter 7 liquidation case. The $95,000 value of the home less the unavoidable liens against it will probably leave the Debtor with an equity in the home of over $45,000. After allowance of the Debtor's maximum allowable exemption of $7,900, 11 U.S.C. §§ 522(d)(1), (d)(5), over $37,000 would appear to be available for distribution to unsecured creditors in a Chapter 7 case. We previously found the existence of creditors with claims totalling over $33,-000. 104 B.R. at 692. It may be necessary for the Husband or the Chapter 13 Trustee to sell the home in order that these creditors will receive what they would have received in a Chapter 7 liquidation case.[6] Except for receipt of his exemption and the surplus after paying his creditors, the Debtor may not have very much left after a bankruptcy sale of the home.[7]

**7.** As we indicated in our Adjudication, 104 B.R. at 695 n. 8, the Debtors may have been better advised to dismiss their bankruptcy and receive the surplus of over $37,000 which would apparently have been paid over to them in the post-sale distribution had there been no bankruptcy filed or this proceeding not been filed. The Debtors chose to eschew this advice, probably due to their unwillingness to face their inability to retain the home and/or their desire to retain it as long as possible. However, they must now face the full extent of their predicament.

The creditors of the Debtors are therefore likely to be the only beneficiaries of this proceeding. This is, of course, as it should be, since § 548 provides an avoidance power which is basically a remedy for the benefit of creditors.

Given the hiatus that has resulted in administration of the Debtors' case as a result of the remand procedure, we will promptly schedule a Confirmation hearing and insist that the Debtors propose a confirmable plan prior to that hearing. We again note that we consider confirmation unlikely unless the Debtors agree to a sale of the home which they have apparently been desperately and understandably fighting to retain.

## J. CONCLUSION

An appropriate Order will be entered.

### ORDER

AND NOW, this 27th day of April, 1990, after a supplemental trial of March 22, 1990, in the above-captioned adversary action in light of the Order and Memorandum of the District Court of February 14, 1990, in C.A. No. 89–6659, vacating our Order of August 17, 1989, and remanding this matter to us, it is hereby ORDERED AND DECREED as follows:

1. Judgement is reinstated in favor of the Husband–Debtor, THOMAS BARRETT, and against the Defendants, COMMONWEALTH FEDERAL SAVINGS AND LOAN ASSOCIATION, ROBERT J. GUNN, and JOHN D. GREEN, SHERIFF, CITY OF PHILADELPHIA.

2. The transfer of December 5, 1988, of the interest of the Husband–Debtor in the property situated at 3205 Brighton Street, Philadelphia, Pennsylvania 19149, effected in the sheriff's sale of that date is hereby set aside, pursuant to 11 U.S.C. § 548(a)(2).

3. However, the Defendants need not take any steps to effectuate paragraph two of this Order unless and until a confirmation order is entered in this case.

4. The Debtors shall file any necessary Amended Plan, in light of the aforesaid Order, and serve same upon all other counsel listed below and this court in chambers on or before May 9, 1990.

5. Any interested party objecting to the aforementioned Amended Plan shall file and serve Objections upon all other interested counsel and this court in chambers on or before May 17, 1990.

6. A *final* Confirmation Hearing and a hearing on the Trustee's motion to dismiss this case shall be held on

TUESDAY, MAY 22, 1990, at 10:00 A.M. shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

7. No continuances of the hearings scheduled in paragraph six shall be permitted, and this case may be dismissed if no plan can be confirmed on May 22, 1990.

If, at this point, the Debtors decide to opt for the alternative of dismissal, or if we dismiss this case, the result of this decision will be undone, unless we order otherwise. See 11 U.S.C. § 349(b)(1)(B). Because we consider dismissal a strong possibility, we will not require the Defendants to take any action to undo the sale until the Debtors' Plan is confirmed, thereby avoiding confusion in having to possibly unravel the undoing of the sale.