**In re Thomas BARRETT, Sharon Barrett, Debtors.**

**Bankruptcy No. 89–10738S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 30, 1992.

---

Eric E. Frank, Miller & Miller, Philadelphia, Pa., for debtors.

Ellen McDowell, Drinker Biddle & Reath, Philadelphia, Pa., for Commonwealth Federal Sav. & Loan Ass'n.

Eugene F. Brazil, Fort Washington, Pa., for Robert J. Gunn.

Edward Sparkman, Philadelphia, Pa., trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

In *Barrett v. Commonwealth Federal Savings & Loan Ass'n,* 939 F.2d 20 (3d Cir.1991) ("*Barrett V*"), the Court of Appeals affirmed a decision of the District Court, reported at 118 B.R. 255 (E.D.Pa. 1990) ("*Barrett IV*"), in a proceeding arising from this case. *Barrett IV,* reversed, for the second time, a decision of this court, reported at 113 B.R. 175 (Bankr. E.D. Pa. 1990) ("*Barrett III*"), allowing THOMAS J. BARRETT ("the Husband") to set aside the sheriff's sale of the home, located at 3205 Brighton Street, Philadelphia, Pennsylvania ("the Home"), owned by him alone, and resided in by him, his wife and co-debtor, SHARON B. BARRETT ("the Wife") (collectively the Husband and the Wife are referenced as "the Debtors"), and the Debtors' children, pursuant to 11 U.S.C. § 548(a). Earlier, the District

Court, in a decision reported at 111 B.R. 78 (E.D.Pa.1990) ("*Barrett II*"), had remanded our original decision favorable to the Husband, appearing at 104 B.R. 688 (Bankr.E.D.Pa.1989) ("*Barrett I*").

In *Barrett I*, 104 B.R. at 694–95, we opined that, in light of our decision setting aside the sale of the Home, pursuant to § 548(a), Commonwealth Federal Savings and Loan Association ("Commonwealth"), the Husband's mortgagee and the judgment creditor in the state-court action resulting in the sheriff's sale of the Home; and Robert J. Gunn ("Gunn"), the purchaser at the sale, appeared to have claims against the Debtors under 11 U.S.C. § 548(c). While *Barrett I* was on appeal, Gunn agreed to accept a secured claim of $9,503.65, representing his costs and attorneys' fees in acquiring the Home. Shortly thereafter, Commonwealth agreed to accept a secured claim of $36,310.64. In *Barrett III*, we reinstated our decision in *Barrett I*. In that Opinion, we related the intervening claims settlements and held that the Debtors were obliged to pay these claims in full over the life of their plan. 113 B.R. at 177.[1] The *Barrett III* Order allowed the Debtors until May 9, 1990, to file any necessary further Amended Chapter 13 plan to conform to the rulings set forth in that Opinion. *Id.* at 185.

The Debtors' Second Amended Plan ("the Plan"), which required the Debtors to remit payments in excess of $900 monthly to the Trustee over the remaining life of the Plan, was timely filed and was confirmed without objection on May 24, 1990. Although *Barrett III* was appealed, the confirmation Order was not.[2]

On December 20, 1991, the Debtors filed two motions. In the first, they sought to modify the Plan; reduce Commonwealth's allowed claim of $36,310.64 by an $11,161.14 sum received by Commonwealth under the Plan in the interim; and obtain a distribution of the $66,000 held by the sheriff, which would include a refund of a surplus to them. In the other motion, they sought to eliminate Gunn's claim, on the ground that reversal of their proceeding based on § 548(a) should eliminate Gunn's rights based on § 548(c). These motions were listed for hearings on January 23, 1992.

On January 14, 1992, Commonwealth filed what it termed a Motion for Valuation of its secured claim. In substance, it asked us to append about $14,000 to its previously-allowed claim in consideration for the labors of its counsel subsequent to confirmation of the Plan, most of which ($13,503) was attributable to its participation in *Barrett V* before the Court of Appeals. Noteworthy is the fact that Commonwealth did not participate in either of the appeals to the District Court which resulted in *Barrett II* and *Barrett IV*. This motion was also listed before us, on an expedited basis, on January 23, 1992.

At the hearing, Commonwealth called Joseph Troiano, employed by it as a collection manager, who fixed Commonwealth's contemporary claim at $45,079.62 by adding the mortgage balance, after receipt of $11,161.14 from the Debtors, of $21,602.50 to $23,477.12, the entire bill sought by counsel in a proffered fee application. It also called Warren T. Pratt, Esquire, a partner of Drinker, Biddle, and Reath, the firm representing Commonwealth. Pratt testified that he is experienced in bankruptcy law and oversaw most of Commonwealth's

---

1. The decisions of the Court of Appeals in *First National Fidelity Corp. v. Perry*, 945 F.2d 61, 63–67 (3d Cir.1991), apparently reversing the holding of *In re Rivera*, 108 B.R. 553 (Bankr.E.D.Pa. 1989); and in *Barrett V* may make it virtually impossible for debtors to recover homes sold at sheriff's sale through 11 U.S.C. § 548(a) in the future. We believe this to be an unfortunate result because such proceedings allowed debtors and their families to remain in homes in which they had considerable equity. Moreover, such proceedings were not unfair to other interested parties because, in light of § 548(c), debtors utilizing such proceedings were required to make full payment to the judgment creditor and buyer. *See In re Cole*, 89 B.R. 433, 436–38 (Bankr.E.D.Pa.1988).

2. The apparent inconsistency of the results in *Barrett IV* and *Barrett V*, which totally undermined the terms of the Debtors' confirmed Plan, with 11 U.S.C. § 1327(a) and *In re Szostek*, 886 F.2d 1405, 1408–13 (3d Cir.1989), is not discussed in either *Barrett IV* or *Barrett V*.

relevant actions in this bankruptcy court and in the appeals from our Orders.

Gunn was his own sole witness. He testified in support of the retention of his claim of $9,503.69, itemizing attorneys' fees to his counsel on all matters involving the Debtors at $9,800, $3,350 of which predated the decision in *Barrett I* and $6,450 of which came after. He also listed the following out of pocket expenses from the date of his purchase of the Home on December 5, 1988, to September 5, 1991:

| | | |
|---|---|---|
| 33 Loan Pmts. Interest | | 12,100.81 |
| Lost Income | | 5,148.51 |
| Title Search | | 250.00 |
| Misc. Expenses | | 2,225.95 |
| Appeals | 210.00 | |
| Stenographers | 550.00 | |
| Subpoena Fees | 61.00 | |
| "Packard Press" | 165.78 | |
| Locks | 100.17 | |
| Storage | 1,139.00 | |
| Lost Earnings 10 days | | 1,392.64 |
| New Claim | | 21,117.91 |

In addition, Gunn stated that he believed that he was entitled to the rental value of the Home during the period that the Debtors occupied it after the sale.

■ Despite the fact that neither *Barrett IV* nor *Barrett V* discusses the issue, *see* page 390 n. 2 *supra,* we believe that our starting point must be a recognition of the general conclusivity of confirmation of the Plan and the completion of the claims-allowance process which preceded it. To be sure, post-confirmation amendments to a confirmed plan are permissible, *see* 11 U.S.C. § 1329, and the power of the debtor to amend a confirmed plan is much broader than that of creditors. *See In re Gronski,* 86 B.R. 428, 431–32 (Bankr.E.D.Pa.1988). However, the *res judicata* impact of confirmation on all interested parties should not be forgotten. Also, we note that determination of the amounts of claims can be reconsidered. *See* Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3008; and *In re Motor Freight Express,* 91 B.R. 705, 709–11 (Bankr.E.D.Pa.), *appeal dismissed,* 94 B.R. 346 (E.D.Pa.1988). However, "cause" and equities in favor of reconsideration must be shown in order for reconsideration of claims to be granted. *Id.* The impact of reconsideration of claims on the finality of a confirmation order can create a tension which would, in our view, most often come down on the side of preservation of the confirmation order. In light of the foregoing principles, we start with the presumption that the claims, as allowed, remain intact, and are subject to alteration only where supervening or extraordinary factors are proven to be at play.

■ With respect to Commonwealth's claim, we begin from the premise that, as of March 13, 1990, it was fixed at $36,310.64. Only events which directly affected Commonwealth's interests subsequent to that date should alter that determination.

In comparison to the great impact that *Barrett IV* and *Barrett V* had upon the rights of the Debtors and Gunn, the rights of Commonwealth were left relatively unchanged by these decisions. As of May 9, 1990, Commonwealth faced the prospect of payment of its claim in full over five years, enhanced by deferral interest. As of January 23, 1992, Commonwealth is in receipt of over $11,000, representing payment of almost a third of its claim, and has the prospect of immediate liquidation of the balance, though without interest. The only conclusion which we can reach is that Commonwealth has benefitted from the post-confirmation litigational developments, if at all, by a modest margin. Substantial enhancement of its claim, in light of these developments, appears unjustified.

■ The court's Orders of March 13, 1990, and May 24, 1990, confirmed the Plan and fixed Commonwealth's claim against the Debtors as of the confirmation date. The only events which have occurred since May 24, 1990, which could possibly justify an increase to Commonwealth's claim were its expenditures of attorneys' fees in, mostly, the course of the Debtors' appeal of *Barrett IV* to the Court of Appeals. Therefore, we disagree with Troiano's implicit hypothesis, in his calculations, that we can recompute Commonwealth's fees paid to its counsel for services prior to May 24, 1990. Those sums were fixed in the settlement of its claim and the Plan confirmation process. Nor can we review any of

the amounts of principal or interest payable to Commonwealth under the loan secured by the mortgage, which as those were fixed in the claim and confirmation process as well.

■ It is difficult to understand what Commonwealth anticipated gaining by invoking the state court reassessment of damages process, for which compensation for services valued at about $500 is sought. In any event the result of that process was a state court Order relegating the claim-setting procedure to this court. It seems unjust to impose the costs of an unsuccessful process, which was of doubtful propriety, upon the Debtors. Therefore, only Commonwealth's participation in the "successful" Court of Appeals phase of this proceeding would appear to even possibly serve as the basis for an increase in its claim.

Commonwealth articulates one basis under the Bankruptcy Code for an increase of its claim, *i.e.*, 11 U.S.C. § 506(b), which provides as follows:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such a claim, there shall be allowed to the holder of such claim, interest on such a claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

In applying § 506(b), this court has repeatedly held that

> "[a] mortgagee, to be entitled to a claim for attorneys fees against a debtor-mortgagor, must establish that such fees are (1) allowable under § 506(b); (2) provided for in the parties' agreement; (3) reasonable; and (4) allowable under pertinent state law."

*In re Fricker,* 115 B.R. 809, 825 (Bankr. E.D.Pa.1990), quoting *In re Nickleberry,* 76 B.R. 413, 423 (Bankr.E.D.Pa.1987). *Accord, In re Orsa Associates, Inc.,* 106 B.R. 418, 425 (Bankr.E.D.Pa.1989); and *In re Vitelli,* 93 B.R. 889, 894 (Bankr.E.D.Pa. 1988); and *In re Tashjian,* 72 B.R. 968, 974 (Bankr.E.D.Pa.1987).

The first requirement—which amounts to a showing that the mortgage debt is oversecured—is easily met here. The other requirements are more problematic.

The form of the mortgage executed by the Debtors and Commonwealth appears to contain precisely or very nearly the same wording as that concerning which we held, regarding the "Remedies" provisions, in *Vitelli, supra,* 93 B.R. at 896 n. 4; and *Nickleberry, supra,* 76 B.R. at 424–25, that post-petition attorneys' fees were not recoverable. Our reasoning regarding the "Remedies" clauses, *id.* at 425, was that

> the clause allowing a mortgagee to collect counsel fees from a defaulting mortgagor ... authorize[s] fees only in a "foreclosure proceeding." Given the predominance of the "American rule" that parties must bear their own counsel fees unless the parties' contract or applicable law states to the contrary and the well-recognized maxim that contracts, particularly clauses thereof buried in adhesion contracts, are construed strictly against the parties preparing the contracts, we refuse to conclude that the term "foreclosure proceeding" should be read to include any bankruptcy court process, including motions to obtain relief from the automatic stay or the filing of Proofs of Claim. *Cf. [In re] Schwartz, supra,* 68 B.R. [376,] at 382–84 [ (Bankr.E.D.Pa.1986) (FOX, B.J.) ] (reference in 41 P.S. § 406(2) of Act 6 to "other legal action" is not construed as a reference to bankruptcy court proceedings).

Commonwealth, aware that the "Remedies" clause is insufficient to justify its fees, alternatively invokes another clause of the parties' mortgage in support of its claim, which reads as follows:

> 7. Protection of Lender's Security. If Borrower fails to perform the covenants and agreements contained in this Mortgage, or *if any action or proceeding is commenced which materially affects Lender's interest in the Property, including,* but not limited to, eminent domain, *insolvency,* code enforcement, or arrangements or proceedings involv-

ing a bankrupt or decedent, *then Lender at Lender's option, upon notice to Borrower, may make such appearance, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees* and entry upon the Property to make repairs. *Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, shall become additional indebtedness of Borrower secured by this Mortgage.* Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate stated in the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible by applicable law. Nothing contained in this paragraph 7 shall require Lender to incur any expense or do any act hereunder.

We had one prior occasion to consider whether a similar clause justified a recovery of a post-petition attorneys' fees by a mortgagee. In *In re Slawek*, Bankr. No. 89–11668S, slip op. at 8–11, 1990 WL 103735, slip op. at *3–*5 (Bankr.E.D.Pa. July 17, 1990), on the basis of such a clause, we allowed a mortgagee a recovery of $4,199 out of a requested sum of $13,-208.63 from a pro se Chapter 11 debtor who had vigorously opposed the mortgagee's claims, asserting, *inter alia,* recoupment and rescission claims under the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*

As we noted in *In re Garnett,* 99 B.R. 293, 296–97 (Bankr.E.D.Pa.1989), we have a strong disinclination to allow mortgagees any recoveries for post-petition legal services performed in the bankruptcy courts. We have displayed this disinclination in the context of a variety of contract clauses. *See Fricker, supra,* 115 B.R. at 826; and *Orsa Associates, supra,* 106 B.R. at 425. As we noted in *Garnett, supra,* 99 B.R. at 296, it does not appear equitable to allow a

mortgagee to recover its post-petition attorneys' fees just because it has drafted an even more onerous adhesion contract than have other lenders.

We note that the scope of the particular clause in issue is narrow. The services covered by this clause must be proven to be "necessary to protect Lender's interest," not merely actions taken in furtherance of foreclosure, as are necessary to trigger the "Remedies" clause.

In the context of the instant proceeding, the services in issue do not meet this demanding criteria. Irrespective of whether the sheriff's sale of the Home was subject to avoidance or not, Commonwealth stood to get paid in full. In recognition of its lack of actual interest in the proceeding, Commonwealth chose not to participate vigorously in the trial in this court. Furthermore, Commonwealth chose not to participate at all in either of the District Court appeals which resulted in either *Barrett II* or *Barrett IV.* It was, ironically, only the *Debtors'* appeal from *Barrett IV,* which would have never come to pass had it not been for the decisions in *Barrett II* and *Barrett IV* which attracted Commonwealth's attention. Having listened carefully to the testimony of Pratt, we conclude that Commonwealth's participation in this appeal was, in practical effect, like that of an *amicus curiae,* concerned generally with impeding challenges of sheriff's sales by the use of § 548(a) in future cases. In this case, however, Commonwealth's interests were protected by the confirmed Plan, to which it failed to object.

The "Protection of Lender's Security" clause of the mortgage is clearly a contract term which has been prepared solely by Commonwealth. It is an adhesion contract. It therefore must, like the "Remedies" clause considered in *Nickleberry* and *Vitelli,* be construed strictly against Commonwealth. The "Protection of Lender's Security" clause requires the lender to provide "notice to Borrower" before the lender is authorized to "make such appearances" as will protect its interests. Commonwealth has not alleged the provision of any

notice to the Debtors that it was proceeding under this clause.

More significantly, this clause seems to address actions taken in proceedings by a mortgagee on behalf of the borrower to protect the lender's interests, as opposed to the mortgagee taking actions against the borrower in its interests. The lender's right to receive payment of its costs against the borrower, through foreclosure or, arguably, through proceedings in bankruptcy court, appears to be governed by the "Remedies" clause, as the lenders in *Nickleberry* and *Vitelli* assumed.

Clearly, any actions taken by Commonwealth in the proceeding and elsewhere in this case were not undertaken on the Debtors' behalf. Nor did they serve to protect Commonwealth's security to any significant degree. Therefore, we conclude that Commonwealth cannot successfully claim a right under § 506(b) under the aforesaid "Protection of Lender's Security" clause.

Commonwealth also fares badly on the issue of proving that its billings of $13,503 for services on the Court of Appeals phase of this case were "reasonable." We note, in this regard, that Gunn's most able counsel, though not a bankruptcy lawyer subject to "notions of economy" in his billing practices, valued his services in *both* crucial District Court appeals, the *remand* in this court resulting in *Barrett III, and his work in the Court of Appeals* at a total of $6,450, less than half the bill of Commonwealth's counsel for its work in the Court of Appeals alone. We underscore that the District Court appeals were both crucial and perhaps more difficult undertakings than the Court of Appeals phase of this proceeding, because they required convincing the District Court that it must twice reverse this court. Also, Gunn's counsel bore most of the burden of making the record at trial which was of course the basis of all of the appeals.

In contrast to the slight interests of Commonwealth in the outcome of the proceeding, the outcome was, at all stages, crucial to Gunn's interests. In retrospect, we note that Gunn would probably have been better off to accept the result in *Bar-*

*rett III* than to press forward to the present *status quo.* The Home is vacant and apparently has been vandalized. Property values in Philadelphia have declined since the sheriff's sale of December, 1988. However, it is clear that, in the process, Gunn has succeeded in establishing his right to possession of the Premises, however antisocial and self-defeating the establishment of those rights might be. Insofar as this case is concerned, Commonwealth's rights have changed very little.

Finally, while no state law prohibits Commonwealth's recovery of attorneys' fees in the instant context, the presence of 41 P.S. §§ 404(b)(3) and 406(3) heightens the significance of the requirement that attorneys' fees must be both "reasonable" and "actually incurred" to be collected from a mortgagor. We therefore conclude that, in the instant context, Commonwealth cannot satisfy the last three of these four § 506(b) criteria and is not entitled to any enhancement of the $36,310.64 secured claim to which it agreed on March 13, 1990.

■ We now consider the Debtors' efforts to eliminate Gunn's previously-allowed claim of $9,503.69. We agree with the Debtors that the reversal of *Barrett III* justifies reconsideration of Gunn's claim. That claim was based solely upon § 548(c). No § 548(c) claim can survive in a contract where a legal conclusion has been reached that the sheriff's sale is not avoidable under § 548(a).

■ Gunn has no contractual and/or statutory basis such as § 506(b) to support his claim. His attorneys' fees are not compensable in light of the prevalence of the "American rule" that even successful litigants must, in the absence of contractual provisions or fee-shifting statutes stating otherwise, bear their own attorneys' fees. *See, e.g., Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247–71, 95 S.Ct. 1612, 1616–28, 44 L.Ed.2d 141 (1975); and *In re Rittloft Corp., Rittloft Corp. v. DeYoung Construction,* Bankr. No. 91–14053S, Adv. No. 91–0967S, slip op. at 10–11, 1992 WL 12988 (Bankr.E.D.Pa. January 23, 1992).

Apart from the provisions of § 548(c), which are now inapplicable to this case, Gunn can succeed in making claims against the Debtors' estate only to the extent that his claims arise pre-petition, 11 U.S.C. § 502(b), or are deemed allowable as post-petition administrative claim under 11 U.S.C. § 503(b). In this jurisdiction, where we are obliged to follow the relatively narrow definition of pre-petition claims set forth in *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied sub nom. M. Frenville Co. v. Avellino & Bienes*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). *Frenville* holds that a pre-petition claim arises only when a "right of payment" exists. *Id.;* and *In re Farley, Farley v. Boynton Bros. & Co.*, 135 B.R. 493, 495 (Bankr.E.D.Pa.1992). None of the expenditures enumerated by Gunn at the hearing were proven to have arisen pre-petition. Hence, none of these claims will be subject to a right of payment at the date of filing, with the possible exception of the claim for the rental value of the Home for the short period between the sheriff's sale of December 5, 1988, and the Debtors' bankruptcy filing on February 24, 1989.

It is difficult to understand which, of his enumerated expenditures, Gunn contends could possibly satisfy the requirements for administrative claims under § 503(b). Administrative claims include only a narrow category of post-petition benefits and services which necessarily benefit the debtor's estate and creditors as a whole. *See, e.g., In re Philadelphia Mortgage Trust*, 117 B.R. 820, 826–28 (Bankr.E.D.Pa.1990). The enumerated expenses itemized by Gunn may indeed have been prudent and necessary to the success of his assertion of his rights, but it is difficult to see what benefit the Debtors or their estate received from them. Both the Debtors and their estate would appear to have received greater benefit from having been more greatly enhanced by an affirmance of *Barrett I* and/or *Barrett III* and the fulfillment of the terms of the Plan than from the *status quo* in light of the result in *Barrett V.*

The only possible claim of Gunn which meets the demanding administrative claim criteria is Gunn's claim for the Debtors' rent of the Home through the date of decision of *Barrett V.* However, we do not believe that Gunn has a legitimate rent claim against the Debtors. As we indicated in *In re Orient River Investments, Inc.*, 112 B.R. 126, 131 (Bankr.E.D.Pa. 1990),

> a landlord can recover rent on account of uncontracted use and occupancy of a premises only if the landlord is able to prove that a tenant came into possession with the permission of the landlord. *See Brolasky v. Ferguson*, 48 Pa. 434, 435–36 (1865); *Pott v. Lesher*, 1 Yeates (Pa.) 576, 578 (1795); and *Eisen v. Eisen*, 66 Pa.D. & C. 347 (Phila.Co.M.C.1949) (per WINNETT, J.). The only action which a landlord can properly take against a blatant trespasser is eviction. *See Pott, supra,* 1 Yeates at 578, and *Eisen, supra,* 66 Pa.D. & C. at 344.

There was no contractual agreement whatsoever by which the Debtors agreed to pay Gunn rent to remain in the Home. The Debtors remained in the Home under a claim of right, which, having been twice sustained by this court, was not frivolous. Any eviction was, perhaps properly, foregone by Gunn in recognition of the distinct possibility that the Debtors would prevail in the proceeding. When the possibility of retaining the Home disappeared, the Debtors properly, though understandably reluctantly, voluntarily relinquished the Home.

Therefore, Gunn has no valid pre-petition claim or administrative claim against the Debtors. Nevertheless, in light of our statements regarding the sanctity of confirmation orders and determinations on proofs of claim at page 391 *supra*, we are unwilling to compel Gunn to refund payments which he properly received from the Trustee. We will therefore enter an Order that, while future distributions on account of Gunn's previously-allowed claim shall be halted, that aspect of the Debtors' motion requiring him to return funds previously distributed to him by the Trustee will be denied.

An Order consistent with this Memorandum will be entered.

ORDER

AND NOW, this 30th day of January, 1992, after a consolidated hearing of January 23, 1992, to consider (1) the Debtors' motion to modify their confirmed Chapter 13 Plan; (2) the Debtors' motion for reconsideration of the court's Order allowing the claim of Robert J. Gunn ("Gunn"); and (3) the motion of Commonwealth Federal Savings and Loan Association ("Commonwealth") for valuation of its secured claim, it is hereby ORDERED AND DECREED as follows:

1. The first motion is GRANTED in part. The Debtors are granted permission to file and serve upon all interested parties an Amended Plan consistent with this Order and accompanying Memorandum on or before February 7, 1992.

2. The second motion is GRANTED in part. The court's Order of February 16, 1990, allowing Gunn's claim in the amount of $9,503.65 is VACATED in part. Gunn shall not be allowed any further claim beyond the amount distributed to him as of this date, although Gunn shall not be obliged to return to the Trustee any sums previously paid to him.

3. The third motion is also GRANTED in part, and this claim is evaluated as requested. However, in the valuation process, Commonwealth shall not be allowed any claim in excess of the claim of $36,310.64 to which it agreed and which was incorporated into our Order of March 13, 1990.

4. Any objections to the Debtors' Amended Plan filed in accordance with paragraph one of this Order shall be filed and served upon all interested parties listed below and the court in chambers on or before February 18, 1992. If no Objections are filed and served, the Amended Plan may be confirmed without a further hearing.