**In re Robert P. FRICKER, Dolores A. Fricker, Debtors.**

**Bankruptcy No. 89–11904S.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 22, 1990.

Mark Kravitz, Norristown, Pa., for debtors.

Stephen Raslavich, Philadelphia, Pa., for Acceptance Associates of America, Inc. and "line banks".

Ross Weiss, Elkins Park, Pa., for Frank P. Lalley in his capacity as Sheriff of Montgomery County.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

David M. Still, Norristown, Pa., for debtors.

Joel Friedman, Media, Pa., for Herman Neumann.

Ellen McDowell, Philadelphia, Pa., for Meritor Sav. Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant Opinion is intended to resolve the only significant outstanding contested matter in the bankruptcy case of ROBERT P. FRICKER and DOLORES A. FRICKER ("the Debtors"): their Objections to a Proof of Claim filed by Acceptance Associates of America, Inc. ("AAA"). AAA's Claim was originally filed on March 23, 1990, setting forth a request, as of the date of filing of the Debtors' bankruptcy filing on May 24, 1989, in the amount of $80,-559.01. As of May 8, 1990, however, AAA asserted that its claim against the Debtors had increased to $94,517.70 as a result of continually accruing but unpaid interest and late charges.

Due to occasional lapses of the parties' counsel into misdirected contentiousness, we have been forced to deal with several collateral issues and have received rather little which is helpful to us in qualifying AAA's rightful claim. We nevertheless adhere firmly to the conclusions reached in our Opinion of April 5, 1990, that the instant transaction between the Debtors and AAA, while business-related, is subject to the Pennsylvania law regulating Unfair and Deceptive Acts and Practices, 73 P.S. § 201–1, et seq. ("UDAP"). We also reiterate that the actions of AAA are violative of the Pennsylvania Debt Pooling Act, 18 Pa.C.S. § 7312 ("DPA"), the invocation of which reflected admirable ingenuity on the part of the Debtors' counsel. We also repeat that the violation of the DPA and other actions violative of UDAP by AAA entitle the Debtors to certain offsets against their potential liability to AAA. Taking into account the difficulty of quantifying these offsets, we find that AAA's rightful claim should be established at a round figure of $40,000.

In our accompanying Order, we also establish a mechanism by which AAA and HERMAN NEUMANN ("Neumann"), the purchaser of the Debtors' home at a sheriff's sale of April 19, 1989, who has defended the sale, shall pay the attorneys' fees for which they are liable to the Debtors' counsel under 41 P.S. § 407(b). After the presentation and allowance of a sufficiently-detailed Application by the Debtor's counsel, these parties shall be directed to repay these sums to the estate to compensate it at least in part for fees wrongfully taken from it by the Debtors' counsel during the course of this case.

## B. PROCEDURAL BACKGROUND

A detailed statement of the procedural and factual background of this case is set forth in the earlier Opinion of this court of April 5, 1990, in *In re Fricker,* 113 B.R. 856 (Bankr.E.D.Pa.1990) filed in connection with this case (*"Fricker I"*). That proceeding attacked the validity of the state court sheriff's sale of the Debtors' home to Neumann on April 19, 1989, pursuant to a confessed judgment obtained against the Debtors by AAA. We did invalidate the sale but relegated the determination of any claim of AAA and Neumann to the claims process in the Debtors' main bankruptcy case, which is reflected in the instant contested matter. We will only update the Procedural History and Findings of Facts included in *Fricker I,* incorporating by reference the remainder, which we reaffirm unless expressly retracted herein.

In the Order accompanying *Fricker I,* we set aside AAA's confessed judgment against the Debtors as well as the resultant sheriff's sale. We further Ordered that AAA and Neumann could file any Proofs of Claim or Amended Proofs of Claim with the court on or before April 20, 1990, and th~t the Debtors were to file any Objections thereto on or before April 30, 1990. A hearing on Confirmation and the Objections to the Claims, the latter on a must-be-tried basis, were set down for May 8, 1990.

On March 23, 1990, AAA had filed a Proof of Claim (No. 5) in the amount of $80,559.01. On April 18, 1990, Neumann filed Claim No. 6, seeking $16,500 in post-petition rents, and Claim No. 7, seeking $75,000 plus interest, which was apparently his purchase price at the sheriff's sale, which had not yet been refunded.

On April 30, 1990, the Debtors filed Objections to all of these Claims. On May 8, 1990, in a colloquy with Neumann's counsel, we pointed out that his Claims were inconsistent with our Order of April 5, 1990, setting aside the sale; and that the goal of our April 5, 1990, Order was to have him present any claims which he had which were *consistent* with that Order. Neumann's counsel advised that the filing of the Claims were motivated by the fact

that Neumann had not yet received his refund from the sale. We then requested Neumann's counsel to prepare and submit an Order which would permit Neumann to obtain the refund of the price paid. However, instead of submitting such an Order, Neumann proceeded to attempt to circulate a Stipulation between AAA, the Debtors, and the Sheriff's counsel regarding the conditions for a refund. This effort was halted when the Debtors' counsel refused to cooperate in executing such a Stipulation.

We therefore simply entered an Order on May 25, 1990, directing the Sheriff to refund to Neumann all sums paid by him in connection with his purchase of the Debtors' home at the April 19, 1990, sheriff's sale and that Neumann's Proofs of Claim No. 6 and 7 accordingly should be stricken. It was, of course, our intention that Neumann's Proofs of Claim should be stricken only because he will receive reimbursement of all sums paid at the sale from the sheriff. To our surprise, both Neumann and the Debtors filed appeals from this Order. Neumann, in his Statement of Issues on Appeal, averred that this court had "enter[ed] an order directed to the Sheriff only, in known circumstances which virtually assured that the consideration paid by Herman Neumann would not and could not be refunded."

We regard this allegation with dismay. Our May 25, 1990, Order, parroted that submitted by Neumann's counsel regarding the reimbursement of funds paid by him in the sheriff's sale to his client. It was our intention in our Order of April 5, 1990, to facilitate the reimbursement of these funds to Neumann. If Neumann's counsel felt that use of different language was necessary in the Order to obtain reimbursement of these funds, he should have placed it in the proposed Order he submitted to the court. At the very least, we would have expected that Neumann's counsel would ask us to amend or fine-tune the Order if it were insufficient to procure the intended result of securing reimbursement of the funds to Neumann. Particularly distressing is the implication that this court "knew" that the Order was insufficient and

intentionally entered it in this form anyway, presumably merely to bedevil Neumann.

The Debtors' appeal from the May 25, 1990, Order, is merely the latest in a pattern of their counsel's stubborn resistance to efforts by the court to set a firm schedule to resolve the matters at hand. Earlier manifestations of this conduct were failures to comply with this court's Orders of July 27, 1989, and August 7, 1989, in *Fricker I*, resulting in subsequently abandoned appeals from those Orders and, in one instance, the imposition of monetary sanctions against the Debtors' counsel, as described at pages 859–60 of *Fricker I*.

This pattern continued through a sequence in which Neumann moved to compel the Debtors' counsel to divulge the status of funds which the Debtors were allegedly paying in escrow to their counsel towards their obligation to Meritor Savings Bank ("Meritor"), the first mortgagee on their home. After orally stating that we would do so in a colloquy on Neumann's motion on March 13, 1990, we entered an Order that day directing the Debtors' counsel to provide an accounting of these funds within one week. Counsel for the Debtors failed to do so. On April 4, 1990, Neumann filed a motion to enforce this Order. On May 3, 1990, at a hearing on this motion, the Debtors' counsel (incredibly) tried to argue that he was unaware of the Order because the Clerk's Office sent it to his street address instead of his post-office address, despite the fact that (1) the mail dispatched by the Clerk's Office was not returned and hence was presumably delivered; (2) he should have heard us indicate our directive in open court on March 13, 1990; and (3) a copy of the Order was attached to Neumann's motion to enforce the Order. We directed the Debtors' counsel to provide the accounting in oral form to the court and all interested counsel on May 7, 1990, and in written form on May 8, 1990. The accounting produced so reluctantly revealed the reason for counsel's unwillingness to readily provide it. While the Debtors had deposited $21,087.88 with their counsel, $12,474.72 had been withdrawn by their counsel, without court approval, for attorneys' fees and litigation expenses; $5,063.50 had been paid to the Chapter 13 Trustee; $3,530.00 was expended on their business, Brutus, Inc. ("Brutus"); and a balance of but $19.66 remained. These revelations will probably trigger an action by the Trustee against the Debtors' counsel under 11 U.S.C. § 549. They also suggest that the Debtors may not have the resources to prepare a confirmable Plan and are generating motions, appeals, and a general stonewalling mode simply to put off the day of reckoning as to whether they can prepare a confirmable Plan. To prevent any such strategy from succeeding, our Order will schedule a firm date for Confirmation forthwith.

Continuing this pattern, the Debtors moved this court to reconsider those aspects of its decision of April 5, 1990, which refused to fully dispose of all of their claims against AAA at that time and refused to hold the banks which supplied funds to AAA, *i.e.*, the "line banks," liable to them. *See Fricker I*, at 860 n. 1. We denied this motion on May 15, 1990. On May 21, 1990, we granted a motion by the line banks to clarify that, in our Order of April 5, 1990, we intended to dismiss them from the proceeding. The motions for reconsideration having been disposed of, the Debtors and Neumann then filed appeals from our Order of April 5, 1990.

The Debtors also filed a separate adversary Complaint objecting to AAA's Proof of Claim on April 30, 1990. In addition, they filed another separate adversary complaint objecting to Neumann's Proofs of Claim on May 8, 1990. We view both of these Complaints as transparent attempts by Debtors' counsel to circumvent the deadline of April 30, 1990, and May 8, 1990, respectively, established for filing and trying objections to AAA's and Neumann's Proofs of Claim, set forth in our April 5, 1990, Order. The Complaint against Neumann would appear moot in light of our Order of May 25, 1990. On May 8, 1990, we did conduct a hearing on the Debtors' Objections to AAA's Proof of Claim. It would appear that the adversary Complaint against AAA will be rendered moot by this decision. In any event, we are reluctant to give the Debtors another "bite" at AAA's

Proof of Claim, outside the schedule established in our April 5, 1990, Order.

## C. FACTS RELEVANT TO THE MATTER BEFORE US.

The Debtors object to AAA's Proof of Claim, which is the sole substance of what is before us, on four grounds: (1) AAA is not a creditor of the Debtors because it assigned its interest in the Debtors' account receivable to the line banks; (2) The bar date for the filing of claims was, pursuant to Bankruptcy Rule ("B.Rule") 3002(c), January 4, 1990. Therefore, AAA's Proof of Claim, filed on March 23, 1990, is untimely; (3) AAA's and/or the line banks' violations of certain state and federal laws with respect to its (their) transactions with the Debtors preclude AAA (or the line banks) from any recovery from the Debtors; and (4) Neither AAA nor the line banks asserted a counterclaim against the Debtors in *Fricker I*. Therefore, they are precluded by B.Rule 7013 and Federal Rule of Civil Procedure ("F.R.Civ.P.") 13(a) from asserting the claim in this proceeding. The Debtors also raised several additional allegations under the heading "Counterclaims Against AAA and Third Party Claims Against Banks and Herman Neumann." Among these is a demand that the loan transaction between the Debtors and AAA be rescinded and that the Debtors receive an accounting and a reimbursement from AAA and the line banks of all sums received from the Debtors in excess of the principal amount of the loan.

*Fricker I* contained comprehensive Findings of Fact, at 860–64, all of which we incorporate herein. We will discuss and make additional findings here only in reference to the testimony presented on May 8, 1990.

Although faced with the burden of producing evidence in support of their Objections, *see In re Lewis*, 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987), the Debtors initially rested on the record made in *Fricker I*, which was incorporated into this matter by reference. AAA then called Paul Strauss ("Strauss"), trading as Bay Associates ("Bay"), and Salvatore Bello, AAA's principal, as its only witnesses.

Strauss testified that his business locates funding sources for "challenging type loans" which have been previously turned down by other lending institutions. He contended that the Debtors' application, though apparently not turned down elsewhere, was "challenging" because the Debtors were delinquent in remitting substantial funds to the Pennsylvania State Lottery collected by Brutus. Bello presented and described an allegedly more cogent Account History than his previous submissions reciting the amounts due to AAA from the Debtors. In light of his contention that interest and late charges continued to accrue post-petition at the contract rate, Bellow calculated the sum due as of May, 1990, as $94,517.70.

The Wife–Debtor ("the Wife") took the stand to testify in rebuttal. She denied that Brutus had any extraordinary indebtedness to the State Lottery at the time of the Debtors' making the loan in issue or that such an indebtedness was a significant factor in the Debtors' making the loan from AAA. She also claimed that Brutus had been tentatively sold and that the buyers had remitted a $4,000 down payment which was presently being held in a separate escrow account.

## D. DISCUSSION: AAA IS ENTITLED TO A SECURED CLAIM OF $40,000 AGAINST THE DEBTORS.

1. *The Determination of AAA's Rights in the Instant Claims Process, Separate from the Previous Adversary Proceeding, Is Proper.*

As we indicated to the parties in *Fricker I*, the determination of the potential secured claims of AAA (and Neumann, who no longer has a claim) could not be determined with finality until the process of assessing their claims in light of the invalidation of the sheriff's sale had occurred. Therefore, in our Order of April 5, 1990, we put off this process until now.

The Debtors are quite adamant in arguing that the Court erred in its April 5, 1990, Order in "relegating final disposition of the claims of the parties affected by this Order to a supplemental claims process." In

their Reply Brief, the Debtors argue that "the validity of the transaction between the Debtors and AAA was clearly an issue to be decided by the Court" in *Fricker I.* The Debtors claim that they presented evidence which proved that AAA had no right to recover from the Debtors based on the Loan and, since AAA asserted no defense or counterclaim at that time, its claim should have been disposed of, and presumably, per the Debtors, should have been denied entirely, in the April 5, 1990, Order.

However, as we advised the parties before the trial of November 7 and 17, 1989, began, it was necessary to decide whether to set aside the April 19, 1989, sheriff's sale of the Debtors' home before the parties could begin to assess their rights. As of the time of the bankruptcy filing, AAA presumably had no claim against the Debtors, as its obligation had been liquidated in the sheriff's sale. Likewise, Neumann was merely a purchaser of the Debtors' property and would have had no claim against them if the sale were upheld. Claims of these parties against the Debtors would arise if and only if we set aside the sheriff's sale. We thus had to follow the process of first setting aside the sale, then allowing these parties to make their claims in light of that decision, and then determining what claims were justified. Thus, with respect to a determination of AAA's Claim against the Debtor, we informed the parties and stated in *Fricker I,* at 873, as follows:

> Having provided all of the guidance at this juncture which we can as to the ultimate outcome of the determination of the claims of AAA and possibly Neumann, we will proceed to enter an Order, similar to that entered by us in *Orsa I, supra,* 99 B.R. at 624; *Cole, supra,* 81 B.R. at 331–32; and *Corbett, supra,* 80 B.R. at 38,[1] setting aside the sheriff's sale of the Home, but relegating final

disposition of the claims of the parties affected by this Order to a supplemental claims process.

We are unable to determine whether the Debtors apparent refusal to accept the use of this process here arises from a perceived inability to satisfy legitimate claims of creditors and a concomitant desire to simply prolong possession of the ultimately losing proposition of retaining their home; an inability to understand the absence of just alternatives to this progress; or simply venal intransigence.

■ The Debtors claim that F.R.Civ.P. 54, applicable to this Court pursuant to B.Rule 7054, mandated that we provide a complete disposition of the Debtors' claims within the prior adversary proceeding and that it was improper for us to employ the claims determination procedure to finally resolve them. However, F.R.Civ.P. 54 provides, in pertinent part:

> (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, ..., *the court may direct the entry of a final judgment as to one or more but fewer than all of the claims* ... (emphasis added).

Therefore, this Rule specifically provides that a court may enter judgment on some, but not all, of the claims presented to it, as we proceeded to do. Moreover, it would have been impossible for us to have rendered a final determination of AAA's claim prior to the setting aside of the sale and AAA's filing of a claim in light of this. We therefore reject the Debtors' contention that these matters should have been disposed of in the prior adversary proceeding and we shall proceed to render our decision

---

**1.** These Opinions are properly cited as *In re Orsa Associates,* 99 B.R. 609 (Bankr.E.D.Pa. 1989); *In re Cole,* 81 B.R. 326 (Bankr.E.D.Pa. 1988); and *In re Corbett,* 80 B.R. 32 (Bankr.E.D. Pa.1987). The process established in those cases was not disputed by any interested parties. The same process was also subsequently followed in another case which involved a post-petition invalidation of a sheriff's sale, *In re Bar-*

rett, 104 B.R. 688 (Bankr.E.D.Pa.1989), *rev'd in part & remanded,* 111 B.R. 78 (E.D.Pa.1990), *on remand,* 113 B.R. 175, 177–78 (Bankr.E.D.Pa. 1990). Despite our skepticism, *id.* at 866–68, the *Barrett* debtors, like the *Cole* and *Corbett* debtors, ultimately proposed and obtained confirmation of a Plan which, if the terms are performed, will save their homes.

on the Debtors' Objections to AAA's Proof of Claim here, as we intended.

▮ The Debtors' contention that B.Rule 7013 obliged AAA to raise its claim as a counterclaim in Adversary No. 89–0704S, decided in *Fricker I*, is just as easily resolved. The language of B.Rule 7013 itself, negates that contention: "a party sued by a ... debtor in possession need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, ..."

2. *AAA's Proof of Claim, Filed on March 23, 1990, Is Timely, in Light of the Instant Factual Setting, and Need Not Have Been Filed as a Counterclaim in* Fricker I.

▮ The first meeting of creditors in the underlying bankruptcy case was held on October 6, 1989, and the last date to file Proofs of Claim, pursuant to B.Rule 3002(c), was therefore established as 90 days therefrom, January 4, 1990.

AAA filed its Proof of Claim on March 23, 1990. However, it must be recalled that, in addition to voiding the April 19, 1989, sheriff's sale of the Debtors home, our April 5, 1990, Order also provided that

On or before April 20, 1990, Defendants ACCEPTANCE ASSOCIATES OF AMERICA, INC. and HERMAN NEUMANN, or the Debtors on their behalf, may file and serve upon the Debtors and the court in chambers, any Proofs of Claim or Amended Proofs of Claim setting forth any Claims which they may have against the Debtors.

As we pointed out at pages 814–15 *supra*, the fact that our Order of April 5, 1990, *created* the potential that AAA or Neumann could have a claim against the Debtors required that we establish a new bar date for these parties to file claims. AAA's filing, presaging the result of *Fricker I*, was clearly filed within the requisite time-frame.

We note that it was not necessary that the Debtors address their relationship with AAA at all in the course of this bankruptcy case. They could have left the sheriff's sale of their home intact. It would also have been theoretically possible for the Debtors to request that this court set aside the sheriff's sale and then have the Debtors deal with AAA's claims outside of their Plan. However, if they did so, they would be unable to attack the amount of AAA's claim in this court or cure arrears in a Chapter 13 Plan. *See In re Waldman*, 81 B.R. 313, 314 (Bankr.E.D.Pa.1987); and *In re Evans*, 66 B.R. 506, 509–10 (Bankr.E.D. Pa.1986), *aff'd*, 77 B.R. 457 (E.D.Pa.1987). Any lien which AAA held against any of their property would, in that instance, have passed through the bankruptcy unscathed. *See, e.g., In re Fernwood Markets*, 76 B.R. 501, 503 (Bankr.E.D.Pa.1987); and *In re Owens*, 67 B.R. 418, 425 (Bankr.E.D.Pa. 1986), *aff'd*, 84 B.R. 361 (E.D.Pa.1988).

The only Plan filed by the Debtors to date, as of July 6, 1989, is inconsistent with an intention of the Debtors to treat AAA's claim outside of the Plan. This Plan states that AAA will be paid with the proceeds of the sale of Brutus, an occurrence which could take place only within the supervisory powers of the Trustee in this case.

Moreover, dealing with AAA's claim outside of the Plan is inconsistent with the Debtors' other demands in at least two ways. Firstly, the Debtors clearly meant to deal with any claims against them by AAA in this bankruptcy court. In fact, as indicated at pages 814–15 *supra*, they believe, we think incorrectly, that we were obliged to resolve all of those issues in *Fricker I.* Secondly, the Debtors' principal substantive basis for attacking AAA's claim is UDAP. As we indicate at page 819 *infra*, we have considerable doubt as to whether any but a recoupment claim can be mustered against a creditor under UDAP in a business transaction. Therefore, if we had concluded that AAA had not asserted a timely proof of claim in this case, we would, in all probability, have been forced to conclude that the Debtors had no valid substantive basis on which to challenge the amount of AAA's claim. We would then have been forced to allow AAA's claim to simply pass uncontested through the Debtors' bankruptcy case. Upon motion to do so, AAA would then probably readily obtain relief from the automatic stay, *see*

*Evans, supra,* 66 B.R. at 510, and litigate the parties' rights in the state courts.

The Debtors obviously do not want this scenario to transpire. We therefore find that, by their course of conduct, they have waived any objections to AAA's late filing of its claim. We would also add that since AAA's claim never came into existence until our Order of April 5, 1990, was rendered, the late filing was clearly due to "excusable neglect," if it could be considered due to any degree of neglect at all, which caused AAA to delay in its filing of the proof of claim beyond the bar date. *See In re Vertientes, Ltd.,* 845 F.2d 57, 60–61 (3d Cir.1988); and *In re Green,* 89 B.R. 466, 471–72 (Bankr.E.D.Pa.1988).

### 3. *AAA, Not the Line Banks, Is a Creditor of the Debtors.*

■ The Debtors claim that because AAA collaterally assigned its interest in the Debtors' account receivable to the line banks in July, 1985, the Debtors are no longer indebted to AAA and, therefore, AAA is not a creditor of the Debtors. In support of this argument, the Debtors cite 11 U.S.C. §§ 101(4)(A) and (9); and *In re 2001 Cincinnati, Inc. VIP Clubs of America,* 43 B.R. 6 (Bankr.S.D.Ohio 1984).

However, we would observe that Section 101(4)(A) defines the term "claim" very broadly. *Pennsylvania Public Welfare Dep't v. Davenport,* —— U.S. ——, —— ——, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990). Unlike the lessor-claimant in *Cincinnati,* who assigned all aspects of its claim to another party, AAA assigned its interest in the Debtors' account receivable to the line banks as collateral for its loans to them. The line banks are therefore creditors of AAA, not of the Debtors. For that reason, we entered our Order of May 21, 1990, clarifying the dismissal of the Debtors' claims in *Fricker I* as to the line banks.

We also note that the Debtors have made all payments on the loan obligation directly to AAA. And they have had no contact with the line banks. All documentation concerning the loan bears AAA's name. The line banks have not filed any Proofs of Claim seeking to obtain payment from the Debtors. Clearly, any claim arising from the loan transaction of July 1, 1985, belongs to AAA and, under 11 U.S.C. § 101(9)(A), AAA, rather than the line banks, is a creditor of the Debtors.

### 4. *The Debtors' Claims That the Interest Limitations of Act 6 Apply and That They Have Cognizable Claims Under the TILA, Local Court Rule, and RICO Can Be Readily Disposed of as Lacking Merit.*

The Debtors contend that AAA's violations of such diverse law and rules of court as UDAP; DPA; Act 6 of 1974, 41 P.S. § 101 eṫ seq. ("Act 6"); the federal Truth in Lending Act, 15 U.S.C. § 1601, et seq. ("TILA"); Montgomery County Civil Rule ("MCCR") 3013(a); the federal Civil Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"); and common law principles of fraud, misrepresentation, overreaching, and unconscionability preclude AAA from recovery of any sum in excess of the loan proceeds expended by AAA on behalf of the Debtors.

The Debtors admit that the following amounts were expended from the loan proceeds to the following listed entities on their behalf:

| | | |
|---|---|---|
| 1. | Dean Boyer | $ 3,000.00 |
| 2. | Pitcairn, Inc. | 60,280.00 |
| 3. | Security Pacific Consumer Discount Co. | 32,094.16 |
| 4. | Brutus, Inc. | 14,238.84 |
| | TOTAL | $108,613.00 |

It is the Debtors' basic contention that AAA, because of its conduct, is not entitled to interest, late charges, fees, or any other charges, and that any amounts which the Debtors have paid to AAA in excess of $108,612.00, must be refunded to the Debtors.

■ We determined in *Fricker I,* at 866–68, that the loan is *not* subject to Act 6 interest rate limitations or the TILA. Since the loan is a business loan, TILA does not apply. Act 6 interest rate limitations do not apply because the mortgage taken by AAA on their home is in excess of $50,000.00 and is therefore not a "residential mortgage" under Act 6. The Debtors have presented no evidence or cogent

argument which would cause us to change these decisions. We will not, therefore, alter our decisions concerning the inapplicability of TILA and Act 6 to the Loan.

The Debtors have offered no evidence as to how AAA violated MCCR 3103(a)(1). In fact, they did not present to this court any evidence of what this rule provides or how AAA failed to comply with any of its requirements. Clearly, the Debtors have the burden of proof to establish any such alleged violation and they failed to meet this burden.

■ The Debtors have also failed to meet their burden with respect to their claim that AAA violated RICO. In a civil RICO action, the plaintiff, bears the burden of specifying the "racketeering activity" in which the defendant engaged and proving that the defendant engaged in a pattern of such conduct. *See H.J., Inc. v. Northwestern Bell Telephone Co.,* — U.S. —, 109 S.Ct. 2893, 2898–2902, 106 L.Ed.2d 195 (1989); *Marshall–Silver Construction Co. v. Mendel,* 835 F.2d 63, 66–67 (3d Cir.1987); and *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1359–63 (S.D.N.Y.1983), *aff'd,* 719 F.2d 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

The Debtors presented no evidence to establish the elements of a RICO action against AAA. As in the case of its action for the violation of MCCR 3103(a)(1), the Debtors' counsel is obliged to do more than merely state that a violation has occurred. The Debtors have the burden of establishing any alleged violation through the submission of evidence and, here, they failed to meet this burden. Consequently, any claims on the basis of these grounds must fail.

### 5. The Loan, Although It Is a Business Loan, Is Subject to UDAP.

In *Fricker I,* at 868–73, we suggested that, even though the loan in issue was a business loan, and not a consumer loan, it was subject to UDAP and DPA. A request that we revisit this tentative conclusion consumes most of the substantive-law discussion provided in AAA's post-trial Brief.

We have emphasized the broad scope of UDAP in a number of decisions, notably in *In re Jungkurth,* 74 B.R. 323, 334–35 (Bankr.E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa.1988); and *In re Russell,* 72 B.R. 855, 871–72 (Bankr.E.D.Pa.1987). In *Russell,* we expressly held that UDAP applies to loans. 72 B.R. at 871. In *Jungkurth,* we expressly held that UDAP applies to *business* loans. 74 B.R. at 334. We note that the " 'broad and flexible' approach with respect to UDAP" expressed in *Jungkurth* and *Russell* was expressly approved by the Third Circuit in *In re Smith,* 866 F.2d 576, 581 (3d Cir.1989). *See also id.* at 582.

Among the authorities cited by us in *Jungkurth,* in support of our conclusion that UDAP applies in business loans, were the decisions in *Commonwealth v. Tolleson,* 14 Pa.Cmwlth. 72, 122–24, 321 A.2d 664, 692–93 (1974); and *Commonwealth v. Koscot Interplanetary, Inc.,* 54 ERIE CO. L.J. 79, 93 (Erie Co.C.P.1971), where the courts applied UDAP to sales of schemes in which the victims were trained to engage in the business of making others victims of these schemes. The *Koskot* court thus emphasizes that UDAP applies to business as well as consumer transactions, at *id.:*

[T]o limit the application of [UDAP] solely to a consumer, the one who ultimately uses the product, would be to say that this is the only party you cannot defraud.... This cannot be so. [UDAP], by its very title, signifies that it is not solely a Consumer Law. Sec. 201–1 states "This act shall be known and may be cited as the 'Unfair Trade PRACTICES and Consumer Protection Law' " (emphasis added).

That [UDAP] is not limited solely to the protection of the consumer is inherent in Section 201–3. "Unfair methods of conduct of any trade or commerce are hereby declared unlawful."

The conclusions reached by us regarding the applicability of Pennsylvania's UDAP to business transactions are echoed by decisions interpreting UDAP legislation in other jurisdictions. *See, e.g., Mbank Fort Worth, N.A. v. Trans Meridian, Inc.,* 820

F.2d 716, 718–19 (5th Cir.1987) (Texas Deceptive Trade Practices Act covers a transaction involving loans secured by, and obtained for purpose of purchasing, an interest in an oil and gas lease); *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 66 (D.Conn.1982) (the sale of a franchise is covered by Connecticut's Unfair Trade Practices Act,); *LeSage v. Norwest Bank Calhoun–Isles*, 409 N.W.2d 536, 539 (Minn.Ct.App.1987) (investment contracts are covered by the Minnesota Consumer Fraud Act); and *Morgan v. Air-Brook Limousine, Inc.*, 211 N.J.Super. 84, 85, 510 A.2d 1197, 1198 (1982) (a franchise or business venture is within the intendment of the New Jersey Consumer Fraud Act).

However, we acknowledge here, as we did in *Jungkurth*, 74 B.R. at 334–35, that in *Zerpol Corp. v. DMP Corp.*, 561 F.Supp. 404, 415 (E.D.Pa.1983); and *Permagrain Products v. U.S. Mat & Rubber Co.*, 489 F.Supp. 108, 111 (E.D.Pa. 1980), the late former Chief Judge Alfred L. Luongo of our local district court, held, in dictum, that the language of 73 P.S. § 201–9.2(a) confined damages under that section to "any person who purchases or leases goods or services principally for personal, family or household purposes," *i.e.*, not parties to business transactions. We note that Judge Luongo's reference is *only* to the provision concerning maintenance of private actions, 73 P.S. § 201–9.2(a). No such limiting language appears in those provisions relevant to the scope of UDAP generally. *See* 73 P.S. §§ 201–2(2), (3), (4), 201.3 (emphasis in original).

We might have further added that, if Judge Luongo believed that UDAP did not apply at all to business loans, there would have been no reason for him to consider whether § 201–9.2(a) allowed a private civil action to be maintained under UDAP. *See also Smith, supra*, 866 F.2d at 583 ("Section 9.2 is intended to be coextensive with Section 3 of UDAP").

2. As we noted at pages 816–17 *supra,* this is one of the reasons that we deem the Debtor's contention that AAA's claim was not timely filed and must therefore be stricken to lack merit.

However, as we concluded in *Jungkurth*, 74 B.R. at 336, and, more directly, in *In re Saler*, 84 B.R. 45, 48 (Bankr.E.D.Pa.1988),

the use of UDAP by a bankruptcy debtor to assert what was in substance a recoupment against the claim of a creditor arising out of a business transaction [is] nevertheless permissible [regardless of 73 P.S. § 201–9.2].

As in *Jungkurth* and *Saler*, the claims of the Debtors here are in the substantive form of recoupments against the Debtors' claim.[2]

The Debtors claim that AAA violated UDAP, but do not indicate which section of UDAP they deem was violated. However, we addressed this issue in *Fricker I*, at 872, and concluded that AAA's transaction with the Debtors appeared to violate the catchall provision of UDAP, 73 P.S. § 201–2(4)(xvii). This catchall provision of UDAP prohibits "fraudulent conduct which creates a likelihood of confusion or misunderstanding." *See Smith, supra*, 866 F.2d at 581; *Fricker I*, at 872; and *In re Milbourne*, 108 B.R. 522, 533–34 (Bankr.E.D. Pa.1989).

6. *The Debtors Have Proven that Several Aspects of the Instant Loan Transaction Were Violative of the DPA and Otherwise Unconscionable, Justifying Relief from the Full Amount Claimed by AAA Under UDAP.*

AAA accurately points out that, in *Smith, supra*, the Court of Appeals held that, due to the presence of the term "fraudulent" in the catchall provision of UDAP, we must "measure [the creditor's] conduct against the elements of common law fraud, which requires that a party make a material misrepresentation that another reasonably relies upon to his detriment." 866 F.2d at 583. However, proof of these elements is not so difficult as it may seem, as we thusly pointed out in *Milbourne, supra*, 108 B.R. at 533:

The contention that we cannot consider AAA's claim is therefore inconsistent with the substance of the Debtor's UDAP claim, based on the theory of recoupment against such a claim.

The Third Circuit Court of Appeals, in *In re Smith*, 866 F.2d 576, 581–86 (3d Cir.1989), carefully reviewed the applicable law interpreting the scope of Pennsylvania's UDAP. The Court approved, in its interpretation of UDAP, the previously-referenced interpretations of FTC Act and of UDAP by this court, specifically including [In re] *Andrews* [78 B.R. 78 (Bankr.E.D.Pa.1987)]; *In re Jungkurth*, 74 B.R. 323, 334–36 (Bankr.E.D. Pa.1987), *aff'd*, 87 B.R. 333 (E.D.Pa. 1988); and *Russell, supra*, which extended the scope of UDAP to loans secured by mortgages. 866 F.2d at 581–82. Addressing the issue of what sort of conduct must be proven to give rise to a cause of action under UDAP, the *Smith* court states, *id.* at 583, that

> "in order to evaluate whether [the defendant] has violated [the 'catchall'] subsection of UDAP, we must measure its conduct against the elements of common law fraud, which require that a party makes a material representation that another reasonably relies upon to his or her detriment."

However, a closer analysis of the facts and holding in *Smith* reveal that the court interpreted the term "common law fraud" broadly. The court noted that the lender and the borrower in issue had enjoyed an amicable relationship for seventeen (17) years which resulted in almost full satisfaction of a mortgage. *Id.* at 584. Despite this long relationship and the Debtor's assurances that she would cure any delinquencies in her loan, the lender "swiftly and silently commenced foreclosure and soon thereafter obtained a 'snap' default judgment against an unwary and unsuspecting borrower." *Id.* at 584.

The Third Circuit determined that this conduct of the lender rose to the level of fraud because it was substantially unfair, stating, *id.* at 584, as follows:

> "A borrower of money, especially the owner of a residential property mortgaged to a lending institution, may reasonably expect that he or she will receive fair and aboveboard treatment in their dealings and that no undue advantage will be taken by the

lender. Here, Fidelity did not accord Smith such fair treatment.... We hold that [the lender's] conduct is 'unfair' in the most basic sense of the word and fraudulent within the meaning of UDAP."

Hence, the court, in *Smith, supra*, found that the borrower had an actionable claim under § 201–2(4)(xvii) of UDAP based upon the lender's unfair conduct. *Id.* Obviously, the court thus determined that the fraud requirement of UDAP § 201–2(4)(xvii) was satisfied by its finding of unfair conduct on the part of the defendant. It thus reached a result very close to, if not identical with, that reached by this court in *Andrews*, [In re] *Stewart*, [93 B.R. 878 (Bankr.E.D. Pa.1988)] and *Russell*, where we held that a borrower need prove only that a lender engaged in pervasive illegal conduct to state a cause of action under § 201–2(4)(xvii) of UDAP.

AAA purports to find comfort in *In re Bryant*, 111 B.R. 474, 479 (E.D.Pa.1990), in which the court found that a debtor's agreement to convey her home to a realtor to avoid a sheriff's sale, which the realtor subsequently resold to a third party at a large profit, violated UDAP. However, the court's finding that the realtor's conduct was "unconscionable," *id.* at 480, was held sufficient to not only constitute the requisite "fraudulent conduct" under the catchall provision of UDAP, but to support a claim of treble damages against the realtor.

Similarly, in *Milbourne*, we found one aspect of the lender's practices, *i.e.*, failing to advise consumers of the lower total cost of rewriting further advances of funds as new loans as opposed to the refinancing of present loans was a sufficiently "opportunistic" practice, 108 B.R. at 538, to constitute a violation of UDAP.

AAA contends that the testimony of Strauss undermined our conclusion in *Fricker I*, at 869, that the Debtors "did not present a blemished prior credit record." However, the strongest evidence presented regarding the Debtors' alleged adverse credit record was Strauss's statement that a credit report which he had obtained desig-

nated the Debtors as "slow pay." AAA did not, however, offer any such credit report into evidence.

We are unwilling to attach much, if any, significance to Strauss's testimony. He claimed that the Debtors' inability to obtain credit elsewhere was established by the fact that the Debtors' accountant contacted him only after unsuccessful attempts to secure other financing for the Debtors. It is not the usual function of an accountant, however, to obtain loans for his clients. Strauss further testified, without details and we might add, unconvincingly, that he had difficulty placing the Debtors with other lenders and that the Debtors were fearful of action by the Commonwealth for being delinquent in turning over proceeds from the sale of lottery tickets to the Commonwealth. We credit the testimony of the Wife which denied the significance of any indebtedness on lottery tickets. In sum, we find the testimony of Strauss insufficient to establish any blemishes in the Debtors' credit-record. We therefore decline AAA's invitation to conclude that the transaction involved a high-risk loan which justified the imposition of the extraordinary assortment of charges which were placed upon the Debtors in this loan transaction.

As we stated in *Fricker I*, at 869–70, we found the following features of the loan to be characteristics of extreme overreaching: (1) AAA itself charged $7,700.00 in "placement" and "acceptance" fees; (2) Bay imposed a most liberal $12,000.00 broker's fee; (3) Attorney Jonathan DeYoung, the undisclosed part-owner and landlord of AAA, charged the Debtors a $1,250.00 fee for "services" provided to AAA in the transaction; (4) AAA charged the Debtors an exorbitant interest rate of nine (9%) percent over prime on a principal balance including all of the three foregoing charges; (5) The Loan was disclosed as a 15–year loan, yet it actually was to expire after three years with a balloon payment; and (6) AAA failed to adequately explain the terms of and obligations imposed by the Loan. In particular, the Debtors testified that they understood the term of the Loan to be fifteen years. After the further hearing of May 8, 1990, we affirm our conclusion in *Fricker I* that "we totally credit the Debtors' testimony that they did not understand the dynamics of the balloon-payment aspect of the Loan, which is a trap for the unwary," recited at 870.

AAA argues, in its Brief, that the court has no evidence from which to conclude that the interest rate charged the Debtors was "liberal" or "exorbitant," and defended the placement and acceptance fees as a normal components of "a high risk commercial loan to a fledgling business." AAA commends the services performed by Bay on behalf of the Debtors in obtaining a lender for them, something which the Debtors' own accountant (?) was unable to do, and asserts that Bay earned its $12,000.00 fee. Although it is not clear doing what. AAA defends the payment of Attorney DeYoung's fees by stating that "it is customary for borrowers to pay the counsel fees of lenders in connection with loan closings," and that DeYoung faced no conflict of interest because he represented only AAA and never represented the Debtors. AAA argues that the balloon payment was described in "exceedingly plain and straightforward language," *id.* at 864, in the documents executed in connection with the loan. Finally, AAA argues that, even if the aforementioned actions of AAA are determined to be heavy-handed or even unconscionable, they do not rise to the level of common-law fraud required by 73 P.S. § 201–2(4)(xvii).

We find that, in numerous respects, the actions of AAA, in concert with Bay and Attorney DeYoung, do indeed rise to the level of "unconscionable" and "opportunistic" conduct, which we deem, especially when the cumulative effect of all of these actions is considered, to rise to the level of "fraudulent conduct" engaged in by the actors successfully charged with same in *Smith, Bryant,* and *Milbourne.*

Firstly, we find that AAA represented to the Debtors that the term of the loan was fifteen years. Actually, according to Bello's testimony, the loan terminated after three years with a balloon payment. Although having at least some degree of sophistication, we ourselves find it very con-

fusing to understand how a fifteen-year loan terminates in three years. The Debtors, not unexpectedly, experienced the same confusion. The Debtors thought that they had fifteen years to repay the loan when they actually had only three. We are quite curious what, if anything, the representation that the term of the loan is fifteen years refers to when the loan terminates after three years. That AAA even referred to a fifteen-year term creates inexplicable confusion.

In conjunction with the loan, the Debtors executed a Bond and Warranty and an Indenture indicating that the principal amount of the Loan was $129,700.00 to be paid in "180 successive monthly installments of $2,230.17 each," resulting in a "gross obligation of $401,430.60." One hundred and eighty months is fifteen years. Further, AAA's own account summary sheet reflecting payments received from the Debtors with respect to the loan stated that the amount of the loan was $401,430.60 to be paid in 180 monthly installments of $2,230.17.

AAA argues that all of the documents regarding the loan clearly explain what a balloon payment is and that the loan is to be repaid in three years with a balloon payment. The Indenture contains the following language with respect to the balloon payment:

> The monthly payment described is for a term of –180– months; however, it is agreed and understood by both the Borrowers and Lender that the entire balance shall become due and payable –36– months hence. This term and condition herein stated is commonly referred to as a "balloon payment."

To begin with, the quoted language does not explain the concept of a balloon payment; it only states that the Debtors are required to make one. Further, the language does not make clear what sum the Debtors will be required to pay at the end of three years. One possible interpretation is that the balloon payment will be the difference between the gross obligation, $401,430.60 (180 × $2,230.17) and the payments, $80,286.12 (36 × $2,230.17) or $321,144.48. Could a loan in which the principal was but $108,612.00 possibly rise to such a

sum in three years? Even though AAA claims that the Loan is merely a three-year obligation, the Debtors may actually have been liable to pay fifteen years worth of interest, rebated, at the time of the balloon payment, as the loan recited, in the amount of one-half of the amount payable under the Rule of 78's. We characterized the use of such a rebate formula as "unconscionable" in *Jungkurth*, 74 B.R. at 334.

We credit the Debtors' testimony that, in light of AAA's representations, they thought they had fifteen years to repay the Loan. The Debtors relied upon AAA's representation to their detriment, as they became obliged to pay off the Loan twelve years earlier than they expected. AAA's failure to explain the terms amount to a misrepresentation of the term of the loan equivalent to that of the actors in *Smith, Bryant,* and especially *Milbourne*. This conduct foreseeably caused significant misunderstanding and confusion on the Debtors' part which even the best efforts of Bello and his counsel to explain have not dispelled. This aspect of the loan transaction establishes a violation of § 201-2(4)(xvii).

Further, the inclusion of the exorbitant "fees" charged by AAA and Bay into the principal amount of the loan is also a source of confusion. The Commitment Letter represented that the principal amount of the loan was $120,000. The Debtors signed the Commitment Letter based on a loan for $120,000. At the closing, however, the principal amount of the loan was recited as $129,700. The increase was due to the inclusion of various "fees" payable to AAA. We note, however, that even the fees charged by AAA ($7,700.00 placement fee and $1,250.00 fee for DeYoung) only total $8,950.00. Hence, $950 of *additional* fees were charged to the Debtors. Further, since these fees are included in the principal amount of the loan, the Debtors were obliged to pay interest on them.

In *Fricker I, supra,* at 870–72, we pointed out that the charging of an array of brokerage fees, placement fees, and featherbedding attorneys' fees are precisely the circumstances in which the Pennsylvania courts have repeatedly found that lenders

violated the DPA. We note, parenthetically, with respect to DeYoung's fee, that this is not, as AAA attempts to characterize it, an ordinary expenditure of reasonable fees imposed upon a borrower by a lender for the services of an attorney who, while employed by the lender, would normally be expected to be sufficiently independent to exercise some measure of unbiased professional judgment. There is no evidence that DeYoung, or his firm, performed *any* services in this transaction, not to mention services reasonably valued at $1,250. Furthermore, DeYoung is a part owner and the landlord of AAA. These factors were not disclosed to the Debtors. Moreover, these factors obviously deprived DeYoung of any standing as an independent professional and result in the clear inference that the $1,250 fee is merely an effort to skim additional proceeds off the loan to benefit AAA and its owners.

The Debtors further allege that AAA violated the DPA, a contention which we discussed at length and vindicated in *Fricker I*, at 870–73. As we pointed out in *Fricker I*, the facts of the transaction between AAA and the Debtors are very similar to those described in the cases decided under the DPA cited therein in several respects. In each case, a loan was made from the proceeds of which the respective debtors' outstanding debts were paid. Extremely high interest rates were charged along with very substantial charges added by the creditor and a loan broker. Confessed judgments were entered against the respective borrowers, which the courts in the DPA cases, like this court, determined may be invalidated. AAA has presented nothing to convince us that our following conclusion in *Fricker I*, *id.* at 872, was incorrect: "if the transactions in issue in *Davis* [*v. Safeguard Investment Co.*, 239 Pa.Super. 300, 361 A.2d 893 (1976)] or *Baldwin* [*v. Safeguard Investment Co.*, 10 D. & C.3d 505 (Allegheny Co.C.P.1977), *aff'd*, 259 Pa.Super. 590, 393 A.2d 1271 (1978)] constitute 'debt pooling,' then it appears that the instant transaction could easily be so characterized." We now conclude, without hesitation, that the conduct of AAA in this transaction constitutes a violation of the DPA on its part.

However, while we found, in *Fricker I*, that the cases interpreting the DPA "present persuasive authority for the principle that the terms of the instant transaction are unconscionable and are subject to court adjustment," *id.* at 873, we concluded that "UDAP is a more appropriate medium by which the Debtors can reduce AAA's claim to its just measure." *Id.* The DPA does not appear to provide a private right of action or other remedies in favor of the aggrieved party. Rather, it provides only for criminal penalties as punishment for the violation of its provisions. *Id.* at 871.

■ We note that, in *Russell, supra*, 72 B.R. at 871, we held that "[a]ny substantial violation of [the] laws would certainly seem to constitute *per se* 'fraudulent conduct which creates a likelihood of confusion or misunderstanding.'" We therefore conclude that any conduct which constitutes a violation of criminal laws enacted for the protection of consumers, like the DPA, which creates significant confusion and misunderstanding, as did the conduct of AAA in issue here, must perforce be conduct prohibited by the catchall provision of UDAP. Hence, we also conclude that AAA's violations of the DPA constitute violations of UDAP.

■ We also note that AAA misrepresented the amount of the loan to the Debtors in the Commitment Letter. The Debtors relied upon the Commitment Letter in deciding to take the loan. We credit the Wife's testimony that the loan closing took only approximately one-half of an hour and that AAA did not explain all (or even most) of the claims of the loan to the Debtors. AAA's inadequate disclosure of matters which constituted a violation of the DPA contributed to the misunderstanding and confusion resulting from that violation and also constitutes a violation of 73 P.S. § 201–2(4)(xvii) in itself.

7. *In Light of Its Pervasive Violation of UDAP, AAA's Secured Claim Against the Debtors Will Be Reduced to $40,000.*

We now must address the remedy to which the Debtors are entitled for AAA's

UDAP violations. We have already indicated that the Debtors may assert recoupment against AAA's claim for $94,517.70. This requires us to revise the calculations presented to us by AAA, which presume that we will find the loan transaction to be unassailable under UDAP or any other law. However, as in *Jungkurth, supra*, 74 B.R. at 336, the Debtors have presented no evidence nor calculation which "suggests how we can measure ... the reasonable consequences of [AAA's] unfair trade practices."

In *Fricker I, id.* at 869–70, we rejected the viability of each of the Debtors' claims for specific elements of damages caused by AAA's unlawful lending and collection practices, *i.e:* (1) the difference between the December, 1987, sale price for the 900 Welsh Rd. Property and its current market value; (2) the loss of employer-matched savings contributions plus interest withdrawn by the Debtors from accounts with their employer; and (3) lost profits, late charge assessments and other penalties resulting from AAA's practices. We found that any attorneys' fees due to the Debtors under 41 P.S. § 407(b) were payable to their counsel separately, and did not directly affect AAA's claim. *Id.* at 871, 873.

We will, however, limit AAA's proof of claim in the following respects due to its several violations of UDAP. We find that the conscionable and hence collectible principal balance of the Loan is the amount represented in the Commitment Letter, *i.e.*, $120,000. We previously concluded, *see Fricker I*, at 862, 863, that the Debtors have made payments to AAA totalling $140,328.99. Neither party has convinced us that this finding was inaccurate.

Having significantly reduced the principal balance of the loan, we are not willing to significantly alter the rate of interest charged. We calculate the average rate of the floating interest (9% over prime) charged by AAA over the term of the loan to be about 18 percent per annum. Computing simple interest, *i.e.*, ignoring the

Debtors' declining principal balance, as AAA does in the calculations in its Brief, AAA claims that it is entitled to about $65,000 in total interest ($120,000 × .18 × 3) over the three-year term of the loan. However, we cannot ignore the Debtors' declining principal balance, particularly since it declined very substantially after the sale of the Debtors' home in December, 1987.

In making our determination of what is properly due to AAA, we appreciate that, since the amount due should be calculated on a declining balance formula, and that we are altering the principal balance downward from $129,700 to $120,000, the calculation is very difficult.[3] We also recognize that the *Baldwin* case is precedent for justification of the disallowance of *all* interest charges to a lender guilty of "debt pooling." Therefore, we are not inclined to devise a measurement which is generous to AAA. However, we will not totally utilize the approach of the *Baldwin* court, as it is clear to us that the Debtors had some awareness of the fees charged to them and were quite aware of the applicable high rate of interest. We then shall attempt to devise a measurement in which, as closely as possible, "the punishment fits the crime."

We have decided to break the calculations of interest properly due to AAA into three phases: (1) July, 1985, the date that the loan was made, to December, 1987, at which time the Debtors paid $77,525.59 to AAA; (2) December, 1987, to July, 1988, at which time AAA had the damages assessed against the Debtors in the Montgomery County confession of judgment proceeding; and (3) July, 1988, to the projected confirmation date of July, 1990.

Our reason for creating the third phase is that, at that time, AAA's judgment against the Debtors was liquidated. At this point, the Debtors' obligation to AAA merged with the judgment, and interest at

---

**3.** In this regard, we concede that our calculations in *Fricker I*, at 869, were erroneous. The figure which we cited as the potentially proper finance charge of $39,444.50 was derived from a table which described a loan in which the entire principal balance of $120,000 would be liquidated in three years. The balance on the instant loan would clearly not be liquidated in three years. Although the amount has never been identified, a substantial balloon payment would have been required in connection with the instant loan *after* the three-year period had run.

only the statutory rate of six (6%) percent, as provided in 41 P.S. § 202, would ordinarily be all that is chargeable by AAA. *See, e.g., In re Presque Isle Apartments, L.P.,* 112 B.R. 744, 747–48 (Bankr.W.D.Pa. 1990); *In re Klein,* 106 B.R. 396, 401–02 (Bankr.E.D.Pa.1989); *In re Rorie,* 98 B.R. 215, 218–19 (Bankr.E.D.Pa.1989); *In re Ocasio,* 97 B.R. 825, 826 n. 1 (Bankr.E.D. Pa.1989); and *In re Herbert,* 86 B.R. 433, 436–37 (Bankr.E.D.Pa.1988), *aff'd sub nom. Herbert v. Federal Nat'l Mortgage Ass'n,* 102 B.R. 407 (E.D.Pa.1989). We recognize that, in *Fricker I,* we struck down AAA's confessed judgment. However, it appears patently unjust to allow AAA to reap a windfall as the result of our Order. We therefore will reduce the interest allowable to AAA over the period of this third phase to the statutory rate set forth in 41 P.S. § 202.

We also recognize that our calculations are approximations. However, we believe that we could fix the claim of AAA at any amount from zero to over $94,000, and it is almost impossible to make this calculation with precision.

The balance due to AAA over the first phase fluctuated from slightly over $110,000 to $120,000. We therefore shall measure the first phase interest at $115,000 × .18 per annum × 2½ years, arriving at a calculation of interest at about $52,000 over the first phase. In the second phase, the balance was reduced from about $110,000 by about $75,000 to approximately $35,000. Interest in this six-month phase, also measured at 18 percent per annum, is there calculated to be about $3,150. During the last phase, interest on the $35,000 balance would accrue at the rate of only six (6%) percent per annum, or in the amount of approximately $4,200. The total interest collectible would therefore be about $59,350. Added to the allowable $120,000 principal balance, the total amount due would be approximately $179,350. The Debtors paid $140,328.99. The total principal and interest still payable would therefore come to slightly more than $39,000.

In addition to principal and interest, AAA also demands "Legal Fees" of $16,358.00 and "Late Charges" of $4,638.00. AAA correctly observes in its Brief that, in *In re*

*Nickleberry,* 76 B.R. 413, 423 (Bankr.E.D. Pa.1987), we stated as follows regarding a mortgagee's entitlement to attorneys' fees as an aspect of its proof of claim against a debtor-mortgagor:

> A mortgagee, to be entitled to a claim for attorneys fees against a debtor-mortgagor, must establish that such fees are (1) allowable under § 506(b); (2) provided for in the parties' agreement; (3) reasonable; and (4) allowable under pertinent state law.

*Accord, In re Orsa Associates, Inc.,* 106 B.R. 418, 425 (Bankr.E.D.Pa.1989); and *In re Vitelli,* 93 B.R. 889, 891 (Bankr.E.D.Pa. 1988).

It seems logical to conclude that AAA is oversecured, since the Debtors' home was alleged to be worth $190,000 and is subject to only Meritor's first mortgage of under $40,000 in addition to AAA's potential secured lien, which we shall determine to also be $40,000. *See Fricker I,* at 860–61, 865. The provision of Act 6 limiting attorneys' fees, 41 P.S. § 406, is not applicable to this transaction, as the instant loan is in excess of the $50,000 cap for a "residential mortgage" obligation subject to § 406. The significant issues are whether the imposition of the fees here is provided for in the parties' agreement and is reasonable.

AAA, in support of the reasonability of its services, had remitted an itemized Attorney Time Summary from its counsel. These submissions appear to include all or nearly all of the requisite detail, as per *In re Meade Land & Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975). *See also Orsa Associates,* 106 B.R. at 426–27. However, these time-sheets also reveal that all of the services for which compensation is sought were performed during the duration of the Wife's former bankruptcy case, Bankr. No. 88–12931S, filed August 23, 1988, and dismissed December 16, 1988, and on or subsequent to the date of the filing of the instant case on May 24, 1989. It is therefore apparent that all of the services for which compensation is sought were performed by AAA's counsel in this bankrupt-

cy court subsequent to the filing of the two bankruptcy cases involving the Debtors.

■ The provision of the parties' Mortgage allowing attorneys' fees to AAA provides, in pertinent part, as follows:

Provided further, that it shall and may be lawful for the Mortgagee, in case default shall be made for the space of –5– days in the payment of any installment of the said principal sum or interest thereon, or of said principal sum or any balance thereof at maturity, ... to sue out forthwith upon a Complaint or any other legal proceeding based upon this Indenture of Mortgage, and to proceed thereon to judgment and execution, for the recovery of the whole of said principal debt, or so much thereof as shall then remain unpaid, and all interest due thereon, together with an attorney's commission for collection, viz: Twenty percent of the indebtedness or Two Hundred Dollars, whichever is the larger amount, besides costs of suit, without further stay, any law, usage or customs to the contrary notwithstanding.

In both *Vitelli*, 93 B.R. at 896–97 & n. 4; and *Nickleberry*, 76 B.R. at 424–25, we refused to read a clause of a Mortgage allowing a mortgagee to collect fees for services performed in foreclosure proceedings as an authorization for the mortgagee to charge for performance of post-petition services in bankruptcy court which were not directly related to the pursuit of state-court foreclosure proceedings. The clause in the instant Mortgage quoted above is no more permissive in allowing AAA to impose charges upon the Debtors for services performed in the course of this bankruptcy case than were the clauses in issue in *Vitelli* and *Nickleberry*. Moreover, in *In re Garnett*, 99 B.R. 293, 296–97 (Bankr.E.D. Pa.1989), we reiterated a general disinclination to allow mortgagees any recoveries for post-petition services performed in bankruptcy court in any circumstances.

We therefore conclude that AAA's claim for attorneys' fees incurred in performing post-petition services in this court must fail, as no such claim is authorized by the parties' agreement.

We have addressed the subject of late charges which might permissibly be claimed by a mortgagee against its mortgagor in *In re Jordan*, 91 B.R. 673, 678–81, 685–88 (Bankr.E.D.Pa.1988); and *Vitelli, supra*, 93 B.R. at 901. We stated, at *id.*, as follows:

emphasizing the difficulty in ascertaining how such charges are computed, we held [in *Jordan, supra* and *Lewis, supra*] that the burden of proving the method of computation and the actual computation of such charges ... was squarely placed upon the creditor and, in the absence of specific evidence as to these points, an attempt to impose *any* late charges would be denied in its entirety.

The Payment History submitted by AAA appears to claim that payments were late in every month after December, 1986. The monthly late charge is calculated at five (5%) percent of the monthly payment of $2,230.17, or $111.50 per month. No attempt was made to establish that the sum of $111.50 is an accurate measurement of the actual injury suffered by AAA each month as a result of the Debtors' late payments. *See Jordan, supra*, 91 B.R. at 680–81. We also note that, after the remittance of over $77,500 to AAA from the sale of the 900 Welsh Property in December, 1987, the Debtors were ahead in their payments to AAA. AAA nevertheless continued to assess late charges in subsequent months against the Debtors.

We agree that the Debtors' payment record, from January, 1987, through November, 1987, was poor. For this 11-month period, and this period only, collection of some late charges might be in order. The maximum charges allowed to AAA would hence be $111.50 × 11, or $1,226.50. We have therefore decided to add about $1,000 in permissible late charges to our calculation of principal and interest to arrive at a balance due on AAA's claim of $40,000.

E. UNFINISHED BUSINESS: WE WILL ALLOW THE DEBTORS' COUNSEL ATTORNEYS' FEES UNDER 41 P.S. § 407(b), BUT THESE SHALL BE PAYABLE TO THE ESTATE TO COMPENSATE IT FOR UNAUTHORIZED FEES COLLECTED BY COUNSEL; AND WE WILL REQUIRE THAT THE DEBTORS PROMPTLY PREPARE AND HAVE A PLAN OF REORGANIZATION CONFIRMED, OR THIS CASE WILL BE DISMISSED.

■ In *Fricker I*, at 870–71, we opined that the Debtors' counsel would most probably be entitled to recover attorneys' fees against AAA and Neumann under 41 P.S. § 407(b) for those services performed which were reasonably necessary to accomplish the end of invalidating the sheriff's sale of the Debtors' home on the basis of AAA's confessed judgment against the Debtors, in violation of 41 P.S. § 407(a). Since we question whether 73 P.S. § 201–9.2(a) can be invoked in the context of a business loan, *see* page 819 *supra,* we retract our statements in *Fricker I*, at 873, that attorneys' fees might also be collectible under that statutory provision.

We will require that the Debtors' counsel submit a detailed Application for said fees and costs, in procedural conformity with *Meade Land, supra;* and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D.Pa.1987), as a condition for receipt of any such fees. However, in determining how the Debtors' counsel will receive payment, we again note the rather distressing fact that the Debtors' counsel, per the accounting of the Debtors' escrow funds submitted on May 8, 1990, had already received, as of that date,

$12,474.72 in attorneys' fees and costs in connection with this case. These sums were taken by counsel without prior Application, notice to interested parties, or court order, in blatant violation of B.Rule 2002(a)(7) and Local B.Rule 2002.2.

At the hearing on May 8, 1990, where this matter came to light, we recommended that the Trustee file a proceeding to recover these fees if counsel failed to voluntarily return them to his clients or pay them to the Trustee. *See In re 31–33 Corp.,* 100 B.R. 744, 747–48 (Bankr.E.D.Pa.1989). We have received no indication, however, that this was done. Therefore, we will order that any sums payable to the Debtors' counsel under 41 P.S. § 407(b) be forwarded to the Trustee to offset any sums retained by the Debtors' counsel which were improperly received and possibly retained by him.

Secondly, the course of this case has caused us to suspect that the Debtors (or their counsel, seeking to recover substantial fees) are attempting to utilize this case as a vehicle for delay, with no real agenda for or prospect of a successful reorganization. *See* pages 813, 815 *supra.* We hope that these suspicions are unfounded. However, we must insist that, as proof positive that these suspicions *are* unfounded, the Debtors shall promptly prepare and file an Amended Plan and that the case shall proceed to confirmation or dismissal.[4] We shall establish July 6, 1990, as the deadline for preparation of any Amended Plan; July 17, 1990, as the final day for filing Objections to confirmation of any such plan; and schedule a final confirmation and dismissal hearing on July 19, 1990.[5]

---

**4.** A difficult question might arise as to whether any order of dismissal would reinstate the sheriff's sale of the Debtors' home. *See* 11 U.S.C. §§ 349(b)(1)(B), (C).

**5.** We note that, as a consequence of our Order of April 5, 1990, voiding the April 19, 1989, sheriff's sale of the Home and striking AAA's underlying confessed judgment, the Debtors could conceivably attempt to cure the loan deficiency as opposed to paying it in full under their Plan. We believe that AAA's deficient disclosure of the balloon-payment aspect of the loan would estop it from arguing that the obli-

gation to it has matured. *Klein, supra,* 106 B.R. at 401.

We also note that AAA may insist on being compensated for allowing the Debtors to "extend the time of making full payment of its judgment debt to it." *Id.* at 402. Upon confirmation of the Plan, the legal rate of interest would cease to run. *Id.* at 402 n. 7. After confirmation, the Debtors would be obliged to pay interest to AAA at the lower of the contract rate or the "market rate" of interest. *Id. See also In re Mitchell,* 77 B.R. 524, 529 (Bankr.E.D. Pa.1987). The latter, of course, promises to be the lower.

## ORDER

AND NOW, this 22nd day of June, 1990, upon careful consideration of the testimony and evidence presented at a hearing of May 8, 1990, on the Objections of the Debtors to the Proof of Claim of ACCEPTANCE ASSOCIATES OF AMERICA, INC. ("AAA") (No. 5), in which we incorporated the record of the trial of November 7 and November 17, 1989, in Adversary No. 89–0704S, and upon careful consideration of all submissions of the parties at this time and in the adversary proceeding, it is hereby ORDERED AND DECREED as follows:

1. AAA's Secured Proof of Claim (No. 5) against the Debtors is reduced to $40,-000.00.

2. The Debtors shall file any necessary Amended Plan, in light of the aforesaid Order, and serve same upon all other counsel listed below and this court in chambers on or before July 6, 1990.

3. Any interested party objecting to the aforementioned Amended Plan shall file and serve Objections upon all other interested counsel and this court in chambers on or before July 17, 1990.

4. Counsel for the Debtors, AAA, and HERMAN NEUMANN ("Neumann") are directed to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtors' counsel pursuant to 41 P.S. § 407(b). However, if this matter is not resolved by that date, the Debtors' counsel may, on or before July 6, 1990, file and serve upon all interested counsel listed below, a Motion requesting such fees, said Motion to be procedurally in conformity with *Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr. E.D.Pa.1987). However, if the Debtors' counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application as well.

5. Any sums which are agreed or determined to be payable to the Debtors' counsel are directed to be paid to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, rather than the Debtors' counsel. The said Trustee shall not remit any sums to the Debtors' counsel unless and until all sums paid to the Debtors' counsel in excess of $500 are returned to the Debtors or remitted to the Trustee.

6. A *final* Confirmation Hearing and hearings on any Motion filed pursuant to paragraph five hereof and to consider whether this case should be dismissed shall be held on

THURSDAY, JULY 19, 1990, at 10:00 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

7. No continuances of the time deadlines set forth herein or of the hearings scheduled in paragraph six hereof shall be permitted, and this case may be dismissed if no plan can be confirmed on July 19, 1990.